OKLAHOMA GAS & ELECTRIC COMPANY *v.* SHIPLEY.

4-3786

Opinion delivered April 1, 1935.

*Hill, Fitzhugh & Brizzolara,* for appellant.

*W. L. Curtis,* for appellee.

BUTLER, J. The appellees were plaintiffs in the court below and the appellant was defendant, and will be referred to in this opinion in the same relation as they appeared in the trial court.

W. G. and H. B. Shipley are partners, doing business as the Shipley Baking Company. The defendant, Gas & Electric Company, is engaged in gathering, transmitting and distributing electric energy in the city of Fort Smith, and the Shipley Baking Company is one of its consumers.

Plaintiffs brought this suit for an alleged overcharge for electric energy purchased from the defendant in the aggregate sum of $1,026, alleging that for fifteen months prior to October 1, 1933, they were eligible as wholesale consumers for rate under schedule E of defendant company, but were required to pay a different and higher rate in the sum named. The answer denied that plaintiffs were entitled to the industrial rate referred to in their complaint, and alleged that defendant had in force, during the time mentioned in the complaint, two industrial rates, each applying to a given class of customers which were served alike without discrimination, depending upon the class in which the customer's service fell. The defendant alleged that, in order to be entitled to the rates under schedule E, the total aggregate demand of the customer must equal or exceed fifteen kilowatts, and that lighting service would be included when the lighting demand did not exceed twenty per cent. of the total aggregate simultaneous light and power demand; that during the time named in the complaint plaintiffs were not entitled to the rate under schedule E; that in July, 1933, defendant ascertained, from the July bill, that plaintiffs were apparently entitled to the benefit of schedule E, and so informed them, notifying them that, if they would install an auto transformer, they would get the benefit of said schedule; that plaintiffs complied with this request, and since that time had had the benefit of schedule E.

On the issues raised by the pleadings, evidence was adduced and the case submitted to a jury which found in favor of the plaintiffs in the sum named in the complaint. Judgment was accordingly entered, and this appeal followed.

At the close of the plaintiffs' testimony, the defendant moved for an instructed verdict on four separate and distinct grounds: first, that no competent evidence had been introduced to show that plaintiffs were entitled to be under schedule E during the time alleged; second, that no testimony had been introduced showing that defendant had any information of the eligibility of plain-

tiffs' plant to schedule E; third, that no competent evidence of damages or discrimination had been offered; and, fourth, that schedule E could not be made applicable until plaintiffs could prove they were taken off the schedules for which they had applied upon showing made to the defendant that they were entitled to schedule E. The first, second and fourth grounds, *supra,* are those urged for reversal of the case.

The reason assigned for the first contention is twofold: First, that the evidence fails to establish the fact that plaintiffs' use of energy came within the terms of defendant's wholesale rate; and, second, that, even if they were eligible, it was necessary for recovery that the plaintiffs prove they had applied for that rate and had equipped themselves to receive it.

The testimony establishes these undisputed facts: In 1921 plaintiffs established a small bakery, using therein fifteen employees. They applied to defendant to furnish energy for lighting their premises and for power to operate their machinery. They were furnished this power under schedules A and D. Schedule A fixed a certain rate for lights and for motors not exceeding one horsepower. Schedule D fixed a lower rate for the energy furnished to operate plaintiffs' machinery. The current for lighting was supplied over a 110-volt wire, and that for power over a 220-volt wire. Separate meters for each line of current were installed.

Plaintiffs' business increased to such extent that approximately ten years after its establishment sixty-five to seventy employees were required, and a corresponding increase in equipment had been installed, and also an increase in the use of energy for power. The monthly bills for electricity became so great that prior to July, 1931, plaintiffs began to complain to the agents of defendant and made frequent requests for relief. These complaints had been made from time to time for at least a year preceding June 5, 1931, and had become so insistent that on that date the defendant, by its manager, directed a letter to a Mr. McNeil, an employee of defendant, advising him that, in order to forestall future complaints, he should

install an instrumentality for determining the flow of the current, so that the consumption of electric energy at plaintiffs' bakery might be checked. On June 26, 1931, McNeil made report of his investigation by letter advising that a comparative check of kilowatt hours for two years had been made finding that plaintiffs' maximum demand "is thirty K.W. on power alone"; and, continuing, said: "We also made an indicating demand check on their lighting meter and found it to be 6.9 K.W. This, of course, will vary, and I feel that this 6.9 is the maximum." The plaintiffs were not advised of the result of this investigation, and no more readings were made until shortly before the transformer was installed. During the interval between McNeil's report in June, 1931, and the time when defendant determined to give plaintiffs the benefit of schedule E complaints continued to be made, but no relief was furnished until October 1, 1933.

In November, 1933, plaintiffs employed Lyle M. Birnham to make a survey of their plant with a view of ascertaining the rates which would have been properly applicable for a period of two years prior to that investigation. Mr. Birnham testified in the case qualifying as an expert analysis engineer in connection with electric power, expenses and costs. He stated that he made the investigation in November, 1933, studying the set-up and the consumption of energy as shown by the bills rendered plaintiffs by the defendant for electric energy used for two years and four months preceding such investigation. From the bills for July to September, 1932, he ascertained that the energy used, coming over the 110-volt line, was sixteen per cent. of the total energy, and that a part of the energy coming over this line was for appliances using energy for power; that a smaller percentage than sixteen per cent. was actually used in light for those months; that for the twelve month period, from October, 1932, through September, 1933, the percentage of energy used at 110 volts was 17.2 per cent. of the total. He stated that his observation of the light demand was that the maximum continued from around six o'clock in the afternoon to the early morning hours—three or four o'clock

A. M.—and that the light and power is used simultaneously throughout that period, the use of light continuing for a longer period than the power. He made a list of the motors, heating devices, and the appliances for lighting, finding that the horsepower in motors is equivalent to 75.346 kilowatts; that there were 11.6 kilowatts for heating and 5.99 kilowatts for lighting; that is to say that the connected load or rating is 6.5 kilowatts for lighting and 93.5 kilowatts for power, and that during the twelve month periods the energy used at 110 volts is 17.2 per cent. He stated that his calculations indicated that, during the time through which the investigation extended, the lighting demand was less than 20 per cent. of the total aggregate simultaneous light and power demand, and that schedule E was accordingly available.

The result of Mr. McNeil's investigation was embodied in the letter written to Mr. Ryan, the manager of defendant, to which reference has heretofore been made. This letter stated that the maximum demand on power was 30 kilowatts and 6.9 kilowatts on light. On cross-examination Mr. McNeil stated that, assuming that the letter stated the correct maximum power and light demand, it would figure the maximum light demand as 18.7 per cent. of the total.

Mr. Birnham was subjected to a rigid cross-examination, the result of which, counsel for defendant argue, disclosed that the witness excluded from his calculation the use of electric current for motors at 110 volts; and counsel, in analyzing Birnham's testimony, contend that the result reached by the witness is contrary to all physical facts, and therefore untrue. The contention is also made that the conclusions reached by McNeil, as stated in his letter, are contradicted by certain charts showing the consumption of energy through the time covered by his investigation, and that the statement to the effect that the maximum for power was 30 kilowatts and for light 6.9 kilowatts is the result of a typographical error. The contention is also made that the calculations made by witnesses for defendant demonstrate to a mathematical certainty that the light demand, during the fifteen month

period preceding October, 1933, was greater than 20 per cent. of the total simultaneous power and light demand, and that therefore the conclusions reached by Birnham are demonstrably false.

We have examined the evidence of the witnesses with care, taking into consideration the argument of counsel for defendant, and have reached the conclusion that there was some substantial evidence tending to show that the light demand of plaintiffs was such as to entitle them, during the fifteen month period claimed, to the benefit of schedule E. As we view it, this is the principal and controlling question in the case.

On the contention that there was no evidence to the effect that plaintiffs had applied for the rate or equipped themselves to receive it, attention is called to the admission by one of the plaintiffs that he had made no demand on the defendant for the rate under schedule E or that he had advised the defendant that a transformer had been installed. This admission, defendant insists, would bar recovery. Also attention is called to the testimony of Mr. Ryan, the manager, who stated that he advised the representative of the plaintiffs to put in a new power circuit and buy another transformer, and that the agent informed him that the plaintiffs declined to do this because it would cost too much money. This testimony was denied by Mr. Edelmann, plaintiffs' agent.

The question as to the purchase of the transformer was not made an issue in the pleadings, but came up incidentally in the testimony, and even then there was no contention that the failure to procure the transformer was the reason for the delay in putting plaintiffs on schedule E, the reason assigned being that plaintiffs' plant was not eligible for the rate. If, however, the purchase of the transformer is to be considered, defendant has failed to show that a transformer was necessary. There were two meters already installed in plaintiffs' plant, one measuring energy used for lights and one for power, and, from defendant's own testimony, it is apparent that these meters were sufficient to enable it to ascertain whether or not schedule E was available to plain-

tiffs, and the equipment already installed was sufficient for affording the required current. Next, there is no showing of any rule of defendant company, or any contract with the consumer, imposing upon the latter the duty to purchase a transformer. There is no proof relating to the cost of this instrumentality or to show that it would be a special expense different to that of serving other consumers of industrial energy. *Hunt* v. *Marianna Electric Co.,* 114 Ark. 498, 170 S. W. 96, and *State ex rel.* v. *Wacesa,* 122 Minn. 348, 142 N. W. 319, 46 L. R. A. (N. S.) 437, are relied on by defendant, but neither of these cases support the contention made. The rule laid down in the last-named case is as follows: "If, then, a particular consumer desires service which the city can supply only by the installation of transformers at an expense which is substantial, and which is not entailed in furnishing power to others, the consumer who occasions such special expense should bear the burden thereof. Any other rule would operate as a discrimination in his favor." From what has just been stated it will be seen that the defendant has not brought itself within this rule. In *Hunt* v. *Marianna, supra,* the utility company had found it advisable to change from one kind of electric current to another. The motors which had been installed by Hunt were not adapted to use of the current as changed, and new motors had to be installed. The question was, who had to pay for them? It was held that it was the duty of Hunt in the first instance to use his own appliances for using the current, and, where the change was not needlessly or capriciously made, he would be required to stand the expense of getting other fixtures adapted to receive the current under the new system. A transformer, as we understand it, however, is not an appliance for the use of electricity by the consumer, but is one whereby the energy may be regulated and transmitted to him for his consumption. On general principles, it would seem to be as reasonable to require customers of a grocery to pay for the scales that weighed their bacon or the quart cups that measured their molasses as to require consumers of electrical energy to pay for the devices by which it was

brought to them. It would also appear as a general rule to be as reasonable that consumers pay for the poles along which the electric wires were strung as for the transformer through which the current was conducted into their place of business. If some special service is required, not given to consumers generally, and which requires a special and substantial expense, then the rule announced in *State* v. *Wacesa, supra,* would apply and the consumer be required to pay.

However, it appears to a certainty that, as soon as plaintiffs were informed they would be given the rate under schedule E, they immediately purchased the transformer without demur. Therefore, after all, it seems that the question of the transformer was a false issue injected into the case.

The theory embodied in the second and fourth grounds for a directed verdict is: before a consumer is entitled to receive the rates under schedule E, he must first ascertain for himself whether his business is eligible for that rate; and, when this has been determined, he must give notice to the utility of his eligibility and make formal demand that he be put under that rate. This theory was embraced in the instructions requested by the defendant. The following cases are cited in support of this contention: *Homestead Co.* v. *Des Moines Electric Co.,* 248 Fed. 439; *Silver Lunch Stores* v. *United Electric L. & P. Co.* (a decision of the city court of New York), 255 N. Y. Supp. 515; *Pantabakos* v. *Rockingham County L. & P. Co.,* 81 N. H. 441, 38 A. L. R. 1063. We are cited also to decisions from public utility commissions.

*Silver Lunch Stores* v. *United Elec. L. & P. Co. supra,* presents a case in which we see no similarity to the case at bar. The complaint in that case proceeded upon the theory that it was the duty of the utility company to select for the plaintiff a service classification at the rates most suitable to the consumer's requirements, and that the company negligently selected a contract which was not the most favorable to the consumer and should be required to respond in damages, the consumer being ignorant of what classification would be most suitable for his needs.

In the Pantabakos case, *supra*, plaintiff applied to defendant company for current, informing one in charge of defendant's office that he intended to use electricity both for lighting and heating and was told he would save money by installing two meters if he was going to use much electricity for heating. Plaintiff installed but one meter and paid the lighting rates for the electricity used. Had he installed the second meter the electricity used for heating would have cost only about one-fourth of what he paid for it. Plaintiff brought suit, and the court held that a corporation furnishing electricity for heating and lighting purposes performs its duty to an intended customer for both uses by telling him that he would save money if he would install two meters, even though the cost of the additional meter would be considerable. In passing, the court observed that it is common knowledge that those engaged in the business of selling standard goods are not accustomed to advise their customers as to the best way to use them, and, applying this to the action of the trial court, it was held that that court erred when it ruled that it is the duty of public service corporations to use reasonable means to give customers adequate information with respect to the economical way of using the commodity purchased. This case, like the Silver Lunch Stores case, presents no contention similar to the one made in the instant case.

In the Homestead Company case, *supra*, the court sustained a demurrer to the complaint with leave to amend. That case was an action to recover the difference between charges made to plaintiff for services and the charges in a less amount to others for like services. The court simply held that in an action *in tort* for damages the difference was not the measure of damages, but that such damages might be either more or less.

The Indiana Commission, at a hearing held on complaint of the Hoosier Stove Company against Indiana General Service Company, P. U. R. 1927B, enlarged on the Pantabakos case, *supra*, and held that an electric company has no duty to advise and see that a customer is operating under the most advantageous schedule, al-

though complaint is made that bills are excessive, and therefore there is no basis for reparation for payment for current under a less advantageous schedule. The holding of the Indiana commission appears to be most nearly in line with the contention of the defendant in the case at bar and tends to support it.

Public service utilities have a virtual monopoly of the business in which they are engaged and a different rule should obtain between them and their customers than that which obtained at common law between vendor and vendee. In ordinary cases where one purchases the goods of another, if the purchaser is not satisfied with the terms or price at which a commodity is offered, he may procure that commodity from another dealer. But such is not the case with those dealing with public service corporations—they must take the commodity offered at the terms and prices named, or do without. Under modern business conditions, to do without the commodity would prove disastrous. It must be used and the required price paid. Therefore, following principles of natural justice, the utility in the first instance should take cognizance of the customer's needs, and, where several rates are in effect, give him the benefit of the one most favorable to his requirements. Then, when the utility discovers that the condition of the consumer has changed, and he is entitled to another and more favorable rate, it is its duty to give the consumer the benefit of this discovery.

In the case at bar the testimony tends to establish the fact that, for more than two years before plaintiffs were given a more favorable rate, they made frequent complaints and requests that the cause of their excessive electricity bills be ascertained and that they be given relief. They possessed no technical knowledge relating to the use of electricity, and had no appliances by which the facts to give them the right to a more favorable schedule could be ascertained. The defendant had both. The parties were not on equal footing, but one held superior position to the other, and it was the duty of the party holding the superior position, according to every

principle of fair dealing, to make the investigation and place the plaintiffs under the schedule most favorable to them and to which they were entitled. From the moment the defendant became aware of the availability of schedule E to the business of plaintiffs, it became responsible to plaintiffs for the difference between the rates it was then charging and the rates to which they were entitled.

The trial court did not err, as defendant contends, in giving instruction No. 4 at the request of the plaintiffs, which told the jury that, if it should find plaintiffs eligible and entitled to the rate under schedule E, and after notice was given defendant it continued to bill for energy at a higher rate, plaintiffs would be entitled to recover the difference between the amount for which they were billed and paid and the amount for which they should have been billed under schedule E. The notice to defendant was not conveyed to it by plaintiffs, but was acquired by it as a result of its own investigation, and no demand for schedule E was necessary after this information had been obtained.

Defendant contends that instruction No. 4, given for the plaintiffs, was in conflict with instruction No. 4 given at its request in that it ignored that part of defendant's instruction No. 4 which told the jury that, in order to make schedule E available for plaintiffs, they must have "agreed to equip themselves with proper appliances to receive service under said schedule." In the first place, as has been heretofore mentioned, it was not the neglect or failure of the plaintiffs to agree to procure the appliances that was assigned as the reason for their not being rated under schedule E. The reason was that their business was not eligible to receive such schedule and rate because their maximum light demand was in excess of twenty per cent. of the total aggregate simultaneous light and power demand. This was the issue. Only a general objection and exception was saved to the giving of instruction No. 4 for plaintiffs. Defendant, by special objection, should have called to the attention of the court the apparent conflict between the two

instructions, but, as we view it, instruction No. 4 as given by the court for the plaintiffs, correctly presented the issues to the jury.

It follows from the views expressed that the judgment of the trial court is correct, and is therefore affirmed.