# EL PASO ELECTRIC COMPANY V. RAYNOLDS HOLDING COMPANY ET AL.

No. 6789.   Decided January 13, 1937.
(100 S. W., 2d Series, 97.)

*Brown & Brooke,* of El Paso, *E. F. Smith* and *Smith, Brownlee & Goldsmith,* all of Austin, for plaintiff in error.

The statute of limitation is available to a public service corporation as a defense in like manner as it is to an ordinary corporation or an individual, and in the absence of fraud the claim for excessive charges were barred by limitation. Shappirio v. Goldberg, 192 U. S., 323, 24 Sup. Ct., 261; Patterson v. Bushong, 196 S. W., 966; Glenn v. Steele, 61 S. W. (2d) 810.

*Wilchar & Wilchar,* of El Paso, for defendants in error.

Where a public utility company has wrongfully demanded and collected large sums of money through a period of years through a false and fraudulent statement placed in its bills sent to plaintiffs, and such statement is repeated each month, it constitutes a continuous fraud and concealment of such fact, and calculated to keep alive the effect of the false representation. Henry v. Publix Theatres Corp., 25 S. W. (2d) 696, writ refused; Davidson v. Commercial Natl. Bank, 59 S. W. (2d) 949; Bass v. James, 83 Texas, 110, 18 S. W., 336; 46 C. J., 546, sec. 33; 17 R. C. L., 309, sec. 69.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

This suit was instituted by Raynolds Holding Company, S. O. Pottorff, Receiver of the First National Bank of El Paso, and M. H. Barrough, Administrator of the estate of J. S. Raynolds, deceased, as plaintiff, against El Paso Electric Company, as defendant, to recover for overcharges on electrical service rendered from August 1, 1921, to August 1, 1932. The parties will be referred to as in the district court.

The original petition was filed February 18, 1933. The defendant company pleaded limitation. Notwithstanding certain findings by the jury, the trial court sustained the plea of limitation as to all items of overcharge prior to February 18, 1931, but rendered judgment in favor of the receiver of the First National Bank for $1048.32, the amount the court found was paid by the bank or the receiver as overcharges after February 18, 1931, and prior to the date of the filing of plaintiffs' peti-

tion. Defendant did not appeal from this part of the judgment, and it became final. Plaintiffs did appeal from that part of the judgment denying a recovery prior to February 18, 1931. The Court of Civil Appeals affirmed the judgment of the trial court in so far as it awarded the receiver the sum of $1048.32, with interest, but reversed the judgment of the trial court and rendered judgment in favor of Raynolds Holding Company, the administrator of the estate of Joshua S. Raynolds, and the receiver for the sum of $14,944.29. This was to be apportioned 46 per cent to the receiver and 54 per cent to the other parties. This represented the amount which the jury found had been paid in the way of overcharges from August 1, 1921, to August 1, 1932, and which the trial court held was barred by limitation. 70 S. W. (2d) 624.

■ In the trial court the defendant interposed a plea of settlement, or accord and satisfaction, but the jury found against it upon an issue which destroyed this plea. In the Court of Civil Appeals defendant did not assign any error attacking the finding of the jury upon this issue or the action of the court in submitting same over objections of the defendant. Although the question is raised in petition for writ of error as to some of the plaintiffs, this Court has no authority to grant relief in this regard as to any of the plaintiffs. In application for writ of error defendant has not questioned the findings of the jury establishing the fact of the overcharges or the amount, and the case is before this Court with these questions settled against defendant. Therefore the sole question which we are authorized to decide here is the question of limitation.

Plaintiffs sued for an alleged overcharge for direct current used in the operation of elevators in their buildings from August 1, 1921, to August 1, 1932, in the sum of $15,215.20. The suit was not based upon a claim that the bills rendered to plaintiffs and paid by them were excessive, so far as the electricity consumed was concerned. The suit was based upon a contention that although the bills rendered were correct as to the amount of current consumed, yet the monthly charges therefor were excessive, due to the application of a certain rate to an excessive estimate of what was known as the "demand." The published and approved rates upon which the service was based were as follows:

"10c per K. W. H. for the first 40 hours of use per month of the *demand.* 5c per K. W. H. for next 500 K. W. H. 2c per K. W. H. for next 2,000 K. W. H.; 1c per K. W. H. for all excess."

Along with the published rate was the following explanation:

"*Demand* is defined as follows: Entire connected load up **to 5** K. W.; 80% of the next 10 K. W. of connected load; 60% of the next 10 K. W. of connected load; but not less than *actual measured demand* which will be used for installations of more than 25 K. W. *Measured demand* will be the greatest average load for any thirty minute interval during the twelve months' period ending with the current month."

The emphasized words are the important ones, and an explanation is necessary. An expert witness defined "demand" in this way:

"The demand means the amount of power necessary to move your machinery; in other words, if you had a 25 KW motor it would take 25 KW to move that motor; now it has nothing to do with the consumption, if you use that 25 KW that is you use that motor constantly for one hour you have used 25 KW hours."

Plaintiffs' installation was more than 25 KW, therefore the demand was more than 25 KW. This being true, under the published rates as above set out, the demand which was to be used as a basis for making the first charge of 10c per KWH was the actual "measured demand." The schedule defines what was meant by measured demand in this language:

"Measured demand will be the greatest average load for any thirty minute interval during the twelve months' period ending with the current month."

It will be noted from the schedule set out above that plaintiffs were to be charged at the rate of 10c per KWH for the first 40 hours of use per month of this measured demand. Therefore, in order to arrive at the amount of current for which a charge of 10c per KWH was to be made, it would have been necessary to ascertain the measured demand and multiply by forty. After this was done, the amounts to be charged for at other rates named was a simple matter. In this case the only complaint is that there was a charge of 10c per KWH made each month on the basis of an excessive "demand," and the other rates are not in question.

It is undisputed that on each and every monthly statement submitted to plaintiffs during the period in question there was a charge of 10c for 2266 KWH, which represented the first 40 hours of use of the measured demand. Dividing 2266 by 40 we have 56.66 KW as the "demand" for which a charge of 10c per KWH was made. Upon the trial of the case the jury

found in effect that plaintiffs' measured demand during the period in question was only 26 KW, and the first 40 hours per month of this demand amounted to 1040 KWH, for which the charge of 10c should have been made. This amounted to an overcharge of $94.98 per month on this item.

The defendant has not attacked the findings of the jury as touching this overcharge, and it necessarily follows that in arriving at a basis for making this charge defendant either failed to measure the demand, arbitrarily adopting 56.66 KW as such demand, or if it did measure the demand it wrongfully charged on a basis of 56.66 KW instead of on the basis of 26 KW.

It seems to be undisputed that no demand meter was ever placed in the building. It is contended, however, that the demand could have been correctly measured by the watt meters which were used to compute the amount of current consumed. According to the testimony of the expert witness it could have been measured in this manner:

"You get the demand from the rotation of the disks which controls the watt meter. There is a technical way of doing it by taking a constant, taking your number of revolutions and multiplying it by this constant, multiplying by thirty six hundred seconds in an hour and dividing it by the seconds of the actual reading, and that will give you the demand for that time."

He explained the matter in a little different way in this language:

"By the method I just told the jury and court, in taking your revolutions and taking the time you take your number of revolutions, multiply it by the constant, multiply it by the thirty six hundred seconds in an hour, and divide it by the actual seconds in which the test is made, and your answer will be in kilowatts."

It seems to be undisputed that plaintiffs paid the monthly bills without protest. While the evidence is to some extent conflicting, it will be taken as proven that a representative of plaintiffs read the watt meters monthly, and a representative also "checked" the bills and o.k'd them monthly before they were paid. There is no proof, however, that anyone representing plaintiffs ever attempted to read the meters for the purpose of measuring the demand, according to the technical method above mentioned. There is no proof that defendant ever explained to anyone representing the plaintiffs how to measure the demand in the manner indicated, or offered to

assist in measuring this demand. The most the testimony will justify is the inference that plaintiffs' engineer read the watt meters for the purpose of ascertaining the consumption of current, and not for the purpose of ascertaining the "measured demand."

■ The jury in response to Special Issue No. 3 found that prior to February 18, 1931, plaintiffs failed to actually discover, and could not by the exercise of reasonable diligence have discovered, that there had been excessive charges in respect to the demand rate collected. The trial court disregarded this finding and held the cause of action barred, giving as a reason therefor the following:

"The court having heard the said motions and the argument in support thereof is of the opinion and finds that the amount of current to be charged for a maximum rate under the schedule, being a measured rate, and same appearing to be at all times constant during a space of ten years or more was sufficient in and of itself to put the plaintiffs, their servants, agents and employees upon inquiry and gave notice that the same had not been measured, and that as to any payments made by any of the parties prior to the 18th day of February, 1931, they are barred by the statute of limitation, and that the plaintiffs are not entitled to recover thereon."

The defendant seeks to uphold this action of the trial court upon the ground, first, that plaintiffs through their agents made their own independent investigation of the correctness of the bills rendered, and in reliance upon their own investigation and judgment paid these bills. This contention is based upon testimony to the effect that Jay Turner, engineer for the building, read the meters and reported to Mr. Judd, and in turn Mr. Judd checked the bills and o.k'd them for payment. As indicated above, it is undisputed that this testimony related to the reading of watt meters for the purpose of ascertaining the amount of current consumed, and the uncontradicted proof shows that no one representing the plaintiffs ever read the meters for the purpose of ascertaining the measured demand, according to the technical method by which it could have been ascertained. We think the proof shows conclusively that Turner and Judd had no knowledge of how to measure the demand, according to the formula mentioned, and there was no device or other method provided by which it could have been measured by them.

■ It is next contended that the finding of the jury to the ef-

fect that plaintiffs could not, by the exercise of reasonable diligence, have discovered the overcharges, is contrary to the evidence. This is predicated upon the proposition that the undisputed proof shows, as a matter of law, that if plaintiffs had exercised reasonable diligence, with the knowledge which the monthly bills disclosed, they could have discovered these overcharges. To sustain this position, however, defendant must rely on the very fact which the trial court recited was sufficient to put plaintiffs upon inquiry. It was this: That because there was a charge of 10c for 2266 KWH on each bill during a period of more than ten years, this alone was sufficient to give notice that the demand had not been measured. The argument is that plaintiffs by dividing 2266 by 40 would have ascertained that this charge was being made on the basis that the measured demand was 56.66 KW, and because this demand was constant, it showed that it had not been measured. We cannot agree to this contention. There is nothing to show that the demand was a fluctuating thing from month to month. Even if it had been measured and found to be only 26 KW instead of 56.66 KW, then the number of KWH in the 10c column would have constantly been 1040, instead of 2266, in each of the monthly bills. The mere fact that the figures were constantly 1040 or 2266 could not alone prove that the demand was not actually measured. Under the plain language of the schedule we think it clear that this demand charge would have necessarily been a constant one, regardless of the amount of current or the number of KW hours. It will be noted that the measured demand for which the 10c charge was to be made was the "greatest average load for any thirty minute interval during the twelve months' period ending with the current month." According to the expert testimony, a measured demand could have been taken for any arbitrary interval. There could have been an instantaneous demand, or a two second demand, or a fifteen minute demand, or a thirty minute demand. In this instance it was to be a thirty minute demand. By this was meant that numerous tests could be made, according to the method hereinbefore mentioned, over a thirty minute period, then the average load shown by these tests during that period would be the measured demand. However, the defendants had a right to take as the demand the greatest average load for any thirty minute period during the preceding twelve months. So it follows that even if the company had taken thirty minute tests during each of the twelve preceding months, the greatest average load shown by any one of these thirty minute tests

would have been the measured demand. There could be but one "greatest average load" during the year, and this would have necessarily resulted in a constant demand for at least twelve months. Consequently, the monthly bills rendered would have constantly shown the same set of figures, as to the number of kilowatt hours for which the 10c charge was assessed. So we conclude that there was nothing in this circumstance alone to give notice that defendant was not actually measuring the demand, even if it be conceded that if plaintiffs had known that the demand was not being actually measured they would have also known that they were being grossly overcharged.

The discussion thus far has undoubtedly demonstrated that the "measured demand" provided for in the schedule was indeed a highly technical something. Indeed, to the ordinary man it was in reality but little more than an abstraction. It is also apparent that the method by which this measured demand might be ascertained from an examination of the watt meters was also highly technical. In all events, it is certain that as to these matters the defendant was in a much more favorable position than plaintiffs. Having based its rates upon these highly technical provisions, it is presumed that it was in position to construe and apply same in a manner which would be fair and just to its customers, and would not result in unfair and unlawful discriminations.

■ Under the statutes of this State, as well as by principles of common law, defendant was prohibited from discriminating between its customers, situated under like circumstances, either as to the service rendered or the charges made therefor. Plaintiffs had a right to rely on the presumption that defendant would obey the law and would give them the benefit of the rate they were entitled to receive under the published schedule. Being in a position both as to an understanding of the true meaning of the schedule and as to the appliances or methods for ascertaining the measured demand applicable to plaintiff, defendant's obligation was to deal fairly and give plaintiffs the benefit of the most favorable rate which they were entitled to receive. Oklahoma Gas & Electric Co. v. Shipley, 190 Ark., 758, 80 S. W. (2d) 635; Salisbury & S. R. Co. v. Southern Power Company, 179 N. C., 18, 101 S. E., 593, 12 A. R. L., 304. See also rules and orders of State Public Service Commissions shown in Annotation at pages 1066, 1067 of 38 A. L. R. We do not intend to hold that public utility companies in every instance are under a legal obligation, prior to installation of

service, to see that customers receive the most economical service and rates, but we do hold that under the circumstances of this case plaintiffs had a right to rest upon the assumption that the bills rendered were not discriminatory, but were based upon a correct estimate of the measured demand. Whatever may be the rule with reference to the use of diligence to discover fraud, we hold in this instance that owing to the relation of the parties, as above set forth, plaintiffs were under no duty to exercise diligence to discover the overcharges (even if they could have reasonably done so) until they came into possession of facts sufficient to cause them to distrust defendant, and also to put an ordinarily prudent person on inquiry. In our opinion, defendant has failed to show any fact or circumstance which justifies us in holding, as a matter of law, that plaintiffs were put upon inqury, and the finding of the jury on the question of notice is in harmony with and supported by the facts and circumstances.

The trial court therefore erroneously disregarded this finding, and the Court of Civil Appeals was correct in reversing and rendering judgment in favor of plaintiffs. In the recent case of Texas Power & Light Company v. Hilltop Baking Co., 78 S. W. (2d) 718, a like question was involved, and the dismissal of the petition for writ of error necessarily constituted an approval of the holding of the Court of Civil Appeals on the question of limitation.

The judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court January 13, 1937.