SIERRA PACIFIC POWER COMPANY, APPELLANT, v. EARL NYE AND GOLDA NYE, HUSBAND AND WIFE, RESPONDENTS.

No. 4654

EARL NYE AND GOLDA NYE, HUSBAND AND WIFE, APPELLANTS, v. SIERRA PACIFIC POWER COMPANY, RESPONDENT.

No. 4655

February 19, 1964                                389 P.2d 387

*Woodburn, Forman, Wedge, Blakey, Folsom and Hug,* of Reno, for Sierra Pacific Power Company.

*Goldwater, Taber and Hill,* and *Wayne L. Mortimer,* of Reno, for Earl Nye and Golda Nye.

## OPINION

By the Court, MCNAMEE, J.:

This is an action to recover certain sums of money allegedly overpaid by the Nyes to the Sierra Pacific

Power Company. The case was submitted to the lower court on stipulated facts. The court adopted said stipulated facts as its findings of fact and concluded therefrom that the Nyes were entitled to judgment in the sum of $8,484.84. It refused to allow the sum of $4,034.77, which was the amount of the overpayment made more than four years prior to the filing of the complaint, and it refused to allow the Nyes any interest.

The Power Company appealed from the judgment and the Nyes cross-appealed from the judgment denying them a recovery of said $4,034.77 and denying them interest.

The agreed facts are as follows (the Nyes will be referred to as plaintiffs and the Power Company as defendant) :

Plaintiffs, since May 15, 1955, have been the owners of the Pony Express Trailer Park in Sparks, consisting of 110 rental spaces for trailers, plus buildings incidental thereto. Defendant is a public utility authorized by the Public Service Commission to sell electricity to consumers.

Pursuant to regulations, defendant filed its rates for the sale of electricity with the Public Service Commission, among which were a Schedule C rate and a Schedule K rate. Plaintiffs' predecessor in interest, Harold's Club, was charged the K rate. When plaintiffs purchased the trailer park on May 15, 1955, the defendant changed the trailer park to the C rate and continued to charge for power used by plaintiffs under that rate until May 5, 1961, when plaintiffs made application to defendant to be placed under Schedule K. They were placed under Schedule K effective as of that date. The difference between the C and K rates for the amount of power used by the plaintiffs between June 1, 1955 and May 5, 1961 amounted to $12,519.61, of which $4,034.77 was for the power used during the period of more than four years prior to the filing of the complaint. Upon defendant's refusal to reimburse the plaintiffs for any part of this difference, this action was commenced.

At all times prior to April 4, 1961 defendant had had an unwritten policy which it had formulated and adopted

of not serving trailer parks under its Schedule K;[1] no rule or regulation authorizing or approving such a policy had been filed with the Public Service Commission, nor has said Commission any rule denying Schedule K to trailer parks.

On April 4, 1961 the case of Eikelberger v. Sierra Pacific Power Company was decided by the Commission. In that case it was held that the owner of a trailer park was entitled to Schedule K if the park had a total connected load exceeding 20 horsepower. Until this decision, plaintiffs did not know of the existence of the K schedule, nor of defendant's unwritten and unfiled rule or policy. At all times since plaintiffs purchased the trailer park they have owned the transformer located on their property and have had a total connected load in excess of 20 horsepower.

The power sold by defendant to plaintiffs and delivered at plaintiffs' trailer park was by plaintiffs resold to various trailer owners in their park. Plaintiffs have never secured a certificate of public convenience from the Public Service Commission.[2]

In its written decision the lower court after reciting the stipulated facts and considering the briefs determined the five points raised by the defendant as hereinafter stated.

1.  Is a power company bound to sell power to others for resale?

The court answered this question in the affirmative where the resale is not to the public but only to the buyer's tenants.

2.  Where there are two optional rates is a public utility bound to select a rate most favorable to the consumer?

The court answered this "Yes," stating that the plaintiffs were entitled to the K rate as a matter of right, because they owned their transformer and the C rate

---

[1]Defendant justifies the allowance of the K rate to Harold's Club, the predecessor in interest of the plaintiffs, on the ground that Harold's Club was serving both the trailer park and a separated motel on a single billing.

[2]Defendant concedes that it is not important whether or not the plaintiffs were technically a public utility.

is not applicable where the consumer owns the transformer.

3. What damages are the plaintiffs entitled to recover?

The damages are the difference between the K and C rate.

4. Is the four-year statute of limitations applicable? Yes.

5. Is interest allowable on the recoverable overpayment?

The lower court refused to allow interest.

The same five points are urged on these appeals.

The contention that defendant was not bound to sell its power to the plaintiffs because they intended to resell the same to their tenants is without merit. It was customary and usual for defendant to serve most trailer parks by delivering electricity to the owner and not by serving each trailer individually. In serving the individual trailer, the owner of the trailer park could charge a rate higher than that paid to the utility, not in excess however of the maximum rate on resale fixed by the rules of the Public Service Commission.

Under the decision in the Eikelberger case the owner of a trailer park was and is entitled to Schedule K if qualified as a K user. At all times since acquiring the trailer park, plaintiffs were qualified as K users, having had a total connected load exceeding 20 horsepower, and having been the owners of the transformer on their property, the high voltage service line, and the underground lines to the individual units.

As a result of the Eikelberger decision all trailer courts in the Reno-Sparks area were placed under Schedule K. Thus, there can be no question that a power company must sell to those trailer park owners qualified as K users under Schedule K even though there is a resale of the power to the trailer park tenants. The plaintiffs by restricting the resale of power to their tenants only did not become competitors of the utility. In fact, in making such distribution of this power they accommodated the utility by assuming the duties of the

maintenance of the individual meters and the connecting lines thereto, the reading of the meters, and the billing and collection of charges, all of which otherwise would have been the obligations of the defendant. Authorities cited by the defendant which hold that a utility is not required to sell its product to a competitor for resale by the latter to other parties are not applicable.

Defendant contends that NRS 704.320 contemplates that where one purchases power for resale it would be under contract and not according to the regular rate. This statute is restricted in its application to public utilities and we hold it was not intended to apply to trailer courts which resell power to their tenants only.

It is questionable whether the two schedules were optional. Assuming however that a trailer park owner had the option of selecting either schedule, it would then become the duty of the utility to inform the customer of the optional schedules in order to enable the customer to select the schedule more beneficial to him. Here the utility acted wrongfully in making the selection itself, a selection which resulted in a material benefit to the utility, without notifying the plaintiffs of their right to a schedule more advantageous to them.

Inasmuch as plaintiffs were entitled to the K rate as a matter of right when they were qualified K users, the charges made by the defendant under Schedule C were improper, and the lower court correctly determined that the payments made thereunder constituted overpayments to the extent of the difference between the K and C rates. Plaintiffs therefore were entitled to judgment for a refund of such overpayments if not barred from recovery by the statute of limitations.

If plaintiffs had paid under the K rate rather than under the C rate, it is conceded that their payments would have been $12,519.61 less for the period between May 15, 1955 and May 5, 1961, $4,034.77 of which was received by the defendant more than four years prior to the filing of the complaint.

Plaintiffs claim that they did not discover that they were entitled to the Schedule K rate until after the

Eikelberger decision, and that therefore under paragraph (d) of subsection 3 of NRS 11.190, their cause of action is not deemed to have accrued until such discovery. It is conceded that if plaintiffs had made a demand for the K rate prior to the Eikelberger decision, it would have been denied by the defendant. In this connection, there was no showing that the defendant knew or did not know that any cause of action had accrued in favor of the plaintiffs until after the Eikelberger decision.

Paragraph (d) of subsection 3 of NRS 11.190 is applicable to a party seeking relief on the ground of fraud. This, the plaintiffs concede. But they argue that the conduct of the defendant in placing plaintiffs under Schedule C when they were eligible for Schedule K and maintaining an unwritten policy of not serving trailer parks under Schedule K constituted fraud.

The complaint was not based on fraud; an overcharge and overpayment are alleged. See NRCP 9(b). It does not appear that the question of fraud was presented to the trial court.[3] In any event neither in its findings nor in its written opinion did the trial court mention fraud. The absence of such an express finding implies a finding that there was no fraud if the question had been presented to the trial court. Cf. Kernan v. Kernan, 78 Nev. 93, 369 P.2d 451. Furthermore, as evidence of such an implied finding, the lower court, in determining that the four-year statute of limitations was applicable, cited 54 C.J.S., Limitations of Actions § 205, at 216. This section states in part: "Except where by statute limitations do not begin to run until knowledge of the cause of action is acquired by the person in whom the cause of action lies, and except where there has been a fraudulent concealment of the cause of action by the person liable, as discussed infra § 206, the rule is generally established that mere ignorance

---

[3]In Arley v. Liberty Mut. Fire Ins., 80 Nev. 5, 388 P.2d 576, decided January 23, 1964, and in the cases therein cited, this court has held that a point not raised in the trial court may not be raised for the first time on appeal.

of the existence of the cause of action or of the facts which constitute the cause will not postpone the operation of the statute of limitations; the statute runs from the time the cause of action first accrues notwithstanding such ignorance, if the facts may be ascertained by inquiry or diligence, or if the ignorance is not willful and does not result from negligence or lack of diligence. The reason for the rule seems to be that in such cases ignorance is the result of want of diligence and the party cannot thus take advantage of his own fault." The court further determined that plaintiffs by some inquiry should have been able to ascertain that there was a Schedule K rate, particularly when the trailer court was operating under that schedule up to the time the plaintiffs purchased it. Although the facts differ in other respects, this determination in itself distinguishes the present case from El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 108 A.L.R. 744. In that case the action was brought to recover overcharges for electric service rendered from August 1, 1921 to August 1, 1932. The action of the trial court in sustaining the plea of limitation as to all items of overcharge prior to the two-year limitation period was reversed. The jury expressly had found that the plaintiffs could not by the exercise of reasonable diligence have discovered the overcharge. The appellate court held that the jury's express finding that the plaintiffs could not by the exercise of reasonable diligence have discovered the overcharge was "in harmony with and supported by the facts and circumstances."

The lower court properly refused to order repayment of the $4,034.77, which constituted the overcharge for the period of more than four years prior to the filing of the complaint.

The only remaining question is whether the plaintiffs are entitled to interest on the amount of the judgment, to wit, on $8,484.84.

In Nevada the award of interest is governed by NRS 99.040 which, insofar as it is applicable, provides:

"When there is no express contract in writing fixing a different rate of interest, interest shall be allowed at the rate of 7 percent per annum upon all money from the time it becomes due, in the following cases:

"1. Upon contracts, express or implied, other than book accounts.

\* \* \* \* \*

"4. Upon money received to the use and benefit of another and detained without his consent."

The amount of overpayment within the four years prior to the filing of the complaint was definitely ascertainable by mere mathematical calculation, being the difference between the K and C rates. The agreed statement of facts fixed this amount at $8,484.84. We have determined that the plaintiffs are entitled to be reimbursed in this amount. Whether the defendant held these several overpayments under an implied contract to repay the money improperly received as provided in subsection 1 of NRS 99.040 or as "money received to the use and benefit" of the plaintiffs "and detained without" their "consent" as provided in the fourth subsection thereof, or as both, is immaterial. Plaintiffs were entitled to repayment by the defendant on the date each overpayment was made, and therefore they are entitled to the statutory rate of interest from each of such dates. Cf. Dollar Investment Corp. v. Modern Market, Inc., 77 Nev. 393, 365 P.2d 311.

The judgment in the sum of $8,484.84 in favor of the plaintiffs is affirmed. The judgment in denying the plaintiffs the additional sum of $4,034.77 is affirmed. Insofar as the judgment omits interest on the recoverable amount of overpayments, it is reversed. The cause is remanded to the lower court with directions to ascertain the amount of interest which has accrued on the $8,484.84 from the date of each overpayment to the date of the judgment, and to modify its judgment so as to include such amount. Costs to respondents and cross-appellants.

Zenoff, D. J., concurs.

Wines, D. J., dissenting:

The Second Claim for Relief is stated in terms of unjust enrichment, the Third Claim is for overcharges. The facts alleged in the First Claim for Relief and the facts settled by the Stipulation of Facts between these parties, have been recited in the majority opinion, except specific mention is not therein made of these facts—there were no negotiations between these parties when the changeover was made; the Nyes were not informed by an agent of the Power Company concerning rate schedules, nor of the rate schedules assigned in charging the Nyes' predecessor, nor of the Power Company's policy regarding trailer parks. It is conceded that in neither the Stipulation of Facts or the Complaint is there any mention of fraud, per se. It does not appear affirmatively from the Record that the trial court was asked to find fraud, nor that fraud was considered by the trial court. But if the issue was before the trial court by virtue of the settled facts, and I think it was, the rule that a point not raised in the trial court cannot be raised on appeal is not properly applied in this instance. The action was argued here without objection by the Power Company on the theory of fraud. If the import of settled facts was not discerned by the trial court it is error.

But it may be that I mistake the sense of the majority opinion. After referring to the rule of timely submission of theory we find this—"The absence of such an express finding implies a finding that there was no fraud if the question had been presented to the trial court." One should not question serendipity. Instead I borrow the majority conclusion that it is the duty of the utility to inform the consumer on matters affecting his interest.

If the rule of the trial court is to be set aside, it must be held as a matter of law that the utility owes the consumer a duty to inform the consumer and to assign the rate he selects as favorable to him. Concealment of a material fact like a misrepresentation of a fact amounts to fraud, if there is an obligation to communicate. The obligation arises from the relationship of the

parties, such as when a confidential relation exists, or it may result from the peculiar and exclusive knowledge of one of the parties. See Words and Phrases, Fraud, Vol. 17–A at page 34; and the same volume at page 127 on the subject of Fraudulent Concealment. A number of jurisdictions, as in Nevada since 1962 by rule of the Public Service Commission, have resolved this issue in favor of the consumer. See El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 108 A.L.R. 744; 38 A.L.R. 1063; and Rules of the Public Service Commission of Nevada for 1962.

The duty to the consumer is found in the public nature of a utility enterprise and the fact that the utility has a knowledge of rate schedules not within the reasonable reach of the consumer. If there is any validity in these assigned reasons for abandoning the maxim of caveat emptor, though a number of jurisdictions have refused to do so, the common law is doctrinaire in this situation. We know by the public law that utilities are invested with certain powers and charged with certain duties to the consumer. If we are honest we will confess our bewilderment with the rate schedules here studied and grant that comprehension of the schedules requires esoteric knowledge. It is manifest that the utility comes to the arena especially well armed.

This is a general policy, but it should be noted that there is a fact peculiar to this action. The allusion is, of course, to be adopted but undeclared policy of assigning a specified rate schedule to a type of enterprise. Our Public Service Commission exists for the purpose of passing upon such policies and it is the duty of the utility to submit the policy for approval before acting upon it. The overcharge, or discriminatory rate, is not in this instance the consequence of an innocent unilateral mistake but of design.

I would therefore reverse the judgment of the trial court directing that judgment be entered for the plaintiff in the full amount prayed for together with the interest as prayed for.

BADT, C. J., and THOMPSON, J., being disqualified, the Governor commissioned Honorable Taylor H. Wines,

Judge of the Fourth Judicial District Court, and Honorable David Zenoff, Judge of the Eighth Judicial District Court, to sit in their places.