No. 24,826.

THE MANHATTAN MILLING COMPANY, *Appellee,* v. THE MANHATTAN GAS & ELECTRIC COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. DURESS—*Recovery of Money Paid—What Constitutes Involuntary Payment.* To constitute duress making a payment of money involuntary, there must be unlawful coercion, destroying free agency to pay or not to pay, according to one's own will. It is sufficient, however, that payment be made under that constraint, whether relief were formerly obtainable by common law action for duress, or suit in equity for wrongful compulsion.

2. SAME—It is only when in an emergency for which he is not responsible, a person is compelled to meet an illegal exaction to protect his business interests, that he may recover the payment; and if, with knowledge of the facts, he voluntarily takes the risk of encountering the emergency, the payment is voluntary and may not be recovered.

3. SAME—*Evidence Discloses Certain Payments in Controversy Were Made Under Duress—Other Payments Made Voluntarily.* The foregoing principles applied in a controversy between a mill company and a company supplying electric energy to operate the mill, and *held,* that certain payments made in response to an advance in rate in violation of a contract, were made under duress, and other payments were made voluntarily.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed April 5, 1924. Affirmed as modified.

*R. P. Evans, George C. Clammer,* both of Manhattan, *J. V. Humphrey,* and *Arthur S. Humphrey,* both of Junction City, for the appellant.

*Edwin A. Austin,* of Topeka, *Hal E. Harlan,* and *A. M. Johnston,* both of Manhattan, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover money paid under duress. Plaintiff prevailed and defendant appeals.

On October 3, 1916, defendant contracted to supply electric cur-

Milling Co. v. Gas & Electric Co.

rent to operate plaintiff's mill until December 31, 1921, at a rate of 1.1684 cents per kilowatt hour. The rate was established after test runs made under conditions existing at the time the contract was negotiated. Defendant's power plant was not equal to the task of supplying its customers, and it was obliged to purchase electric energy from the Rocky Ford Milling & Power Company. In 1918, economic disturbances caused by the war made it necessary that the Rocky Ford company should advance its rates. The rates to several customers in Kansas were too low. Conferences were held looking to amicable adjustment, and application for relief from unremunerative rates, notwithstanding existence of time contracts, was filed with the Public Utilities Commission. The government of the United States agreed to a rate of 3.75 cents and believing the Public Utilities Commission would grant the Rocky Ford company's application, defendant compromised with it on a rate of 2.375 cents. This compromise was made about July 25, and appears to have been accompanied by some assurance of better service by the Rocky Ford company, than it had been giving.

On June 19, 1918, defendant wrote a letter to plaintiff explaining its situation and requesting permission to bill the current supplied to plaintiff at 2 cents per kilowatt hour, beginning July 1, and continuing until after close of the war. Correspondence followed in which plaintiff disclosed interest in the subject and willingness to discuss it further. Plaintiff asked for defendant's station cost. In a letter dated June 29, enclosing the desired information, defendant said:

"You know that the contract with your company was based on contract with the Rocky Ford Milling & Power Co., and it is not being carried out by them. Therefore, we can do nothing else than ask you to share part of our increased cost. We have carried your load on our plant at numerous times at a very material loss. We have been in hopes that Rocky Ford would take care of their contract or that conditions would improve, neither of which are immediately probable."

On July 1, plaintiff asked for more information. A portion of the letter follows:

"We also desire to have you advise us if your company, The Manhattan Gas and Electric Company, comes under the supervision of the Public Utilities Commission. We are informed that the Utilities Commission has granted a raise to Wichita plant to basis of 9¢ per kilowatt. Inasmuch as we are now on contract basis of 1$\frac{1}{10}$¢ per kilowatt, do you think the Commission would interfere to increase the rate?"

These questions were not answered in defendant's reply dated

July 3. Response was made to other inquiries, and the reply closed as follows:

"Trusting that we hear from you soon giving your approval of the increase asked, which will put us in position to continue your service."

On July 25, plaintiff's manager participated in a conference of persons interested in power distribution by the Rocky Ford company. In that conference a rate of 2½ cents to apply to plaintiff was mentioned. The service plaintiff had been receiving was highly unsatisfactory. Frequent interruption of current caused much pecuniary loss. Plaintiff's manager was not unwilling to consider paying more if service could be improved, but he thought the suggested rate too high for a steady supply, twenty-four hours of the day, six days of every week. More correspondence followed, but no agreement was reached. In October, the motor which defendant had installed in plaintiff's mill burned out and service was discontinued until July 1, 1919.

Current for July, 1918, was billed to plaintiff at 2 cents, and for August and September at 2½ cents. Following wheat harvest the milling business is particularly active and plaintiff was wholly dependent on defendant for power. Plaintiff's own power plant was both inadequate and out of service, and it neither had nor could procure a coal contract. Defendant had control over service to the mill by means of a switch located in defendant's plant. The contract provided that if default in payment for service continued for 30 days, defendant might cancel the contract on 30 days' written warning, and might discontinue delivery of current without cancellation of the contract, on a 5 days' written warning. Plaintiff paid the bills by voucher check marked "Paid under Protest"; and the overcharge was included in plaintiff's prayer for relief.

On September 6, plaintiff notified defendant that plaintiff was losing $10.50 per hour for all time the mill did not run for lack of power and that defendant would be held responsible unless continuous 24-hour service was supplied. In some subsequent correspondence plaintiff's manager wrote defendant that the 1918 bills had been paid "because we had no other option." When those bills were paid defendant probably had not satisfied itself that its contract could not be affected by action of the Public Utilities Commission.

This first chapter of the history of the relations between plaintiff and defendant may be considered separately.

We have traveled far from the common law duress of bodily imprisonment or fear of loss of life or member or of imprisonment, to the modern doctrine of involuntary payment. There must be unlawful coercion; but we are no longer restricted to goose flesh producing agencies, and the mythical man of ordinary courage and firmness is no longer invoked as a standard. It is sufficient that the constraint, in the particular instance, destroy free agency to pay or not to pay according to one's own will, whether relief were formerly obtainable by common law action for duress, or by suit in equity for wrongful compulsion. (*Williamson v. Ackerman*, 77 Kan. 502, 94 Pac. 807.) Although the old definition of duress has been referred to occasionally since the decision of the Williamson-Ackerman case, it is clear no fixed or serviceable standard of courage and firmness can be derived from common experience, and timid persons of weak resistance are entitled to redress if their free agency has been wrongfully destroyed, to their detriment.

In this instance, defendant was not seeking to take any advantage of plaintiff's necessities. Defendant was under coercion itself and, as its letter of June 29 frankly stated, felt obliged to pass on to plaintiff part of the increase in its own rate, which it could not successfully resist. Events, however, frequently turn fair bargains into hard bargains, and defendant had no legal justification for charging more than its contract called for. Plaintiff's situation was precarious. It was suffering from bad service and hesitated to commit itself to a specific agreement to pay more until guaranteed it would get what it paid for. Defendant's letter of July 3 was ominous. It indicated the advance in price was necessary to put defendant in position to continue service. The consequences of closing the mill, with contracts outstanding to accept delivery of purchased wheat, and with contracts outstanding to deliver flour sold for export as well as for domestic consumption, were too full of portent to be weighed against price of current necessary to keep the mill going. Indeed, damages resulting from wrongful closing of the mill might be great enough to ruin both parties. The contract remedy for default in making contract payments had no application to discontinuance of service for not meeting a non-contract demand. If plaintiff flatly refused to meet what practically had taken the form of a demand, defendant might, in view of what had occurred, discontinue delivery of current on short notice, and no notice which might reasonably be expected could prevent disaster.

The result is the 1918 payments were made under that constraint which fairly amounts to moral duress.

The district court recognized no difference between conditions under which payments were made before the accident to the motor, and conditions after it was disabled, and returned the following findings:

"That the Manhattan Milling Company, in the months of July and September, 1918, had no other source of power available, and was wholly dependent for its power and electric current used in the operation of its mill and elevator, upon the power furnished by the Manhattan Gas & Electric Company. That the Manhattan Milling Company, in July, August and September, 1918, was, and at all times since has been engaged steadily in the manufacture of flour and other milling products for wholesale and export trade. That the contracts of the plaintiff for flour and milling products were numerous, and it was necessary for plaintiff to operate its mill continuously to fulfill the same. That the plaintiff had reasonable grounds for apprehending that the defendant would discontinue the delivery of electric power and energy to plaintiff in the event that the charges made by the plaintiff were not paid; which action on the part of the defendant would have resulted in serious financial loss to plaintiff, and that plaintiff was compelled by business necessities to pay the excess for power demanded by defendant, and such payments were made under protest.

"That the payments made by defendant for electric current furnished from and including the month of July, 1918, to and including the month of June, 1920, were not made voluntarily, but were made by the plaintiff to the defendant under protest and under the compulsion of business necessities in order that plaintiff might continue its business and comply with contracts that it had made for the delivery of the products of its mills."

The findings are in such form this court is unable to determine what view the court took of either the facts or the law, and it becomes necessary to resort to the evidence in order to test validity of the findings. Certain facts are undisputed. Wherever there is a dispute, the evidence favorable to plaintiff must be accepted.

A few weeks after the motor burned, defendant asked permission to take it out of the mill in order to repair it, but permission was refused, without any statement of reason for the refusal. The motor belonged to defendant. Plaintiff substantially rebuilt its steam plant at a cost of $3,500, and in January, 1919, commenced operation of the mill. The capacity of the mill, operated by this plant, was 75 barrels per day below normal, and the cost per barrel was appreciably above normal. Besides that, as indicated above, plaintiff had been out of the market for coal, was unable to negotiate a contract for a regular supply of coal, and had difficulty in

securing the coal it needed. Plaintiff continued to use some electric current which was billed to it at 2½ cents until April, 1919. After that all current was billed at cost of production plus 10 per cent. The cost varied somewhat from month to month.

Negotiations for repair of the motor commenced in January, 1919, and culminated in a meeting on January 19 between Thomas Page, plaintiff's president, David Page, plaintiff's manager, and Mr. Potter and Mr. Hayden, representing defendant. Potter and Hayden say that, after discussion, they proposed to repair and reinstall the motor at defendant's expense, and to supply current to the mill, as much or as little as plaintiff desired to take, at cost, plus 10 per cent. Plaintiff was to pay its account, amounting to over $1,000. Potter and Hayden say that when the proposition was made, Thomas Page said, "That is a fair proposition;" and David Page said he would give an order for delivery of the motor, and asked how long it would take to have it repaired. David Page alone testified for plaintiff. He corroborated Potter's and Hayden's account of the interview up to the close of Thomas Page's remark, but he said—

"And then I picked up the conversation on it in this way: 'It would be fair if we had no contract, but we have an enforcible contract, as we are operating under the provisions of a new ordinance of the city of Manhattan, and no permission from the public utilities commission, and we will not agree to make any change in these rates until we are forced.' . . .

"Q. What was said there by Mr. Potter and Mr. Hayden, relative to repairing the motor that had burned out? A. Following Mr. Potter's proposition, I made this proposition; that we would go into the matter of rates at a later date, provided they would take the motor out and repair it and put it back in good running condition; but the quality of the service they had been furnishing us was such that it would be no incentive to us to buy current from them unless they could give us adequate service, and we would make no change until they had demonstrated by experience what they could do.

"Q. What was said by Mr. Potter and Mr. Hayden in reply to that? A. There was no agreement made on any of this; neither my proposition nor Mr. Potter's proposition.

"Q. It was left about where you started? A. It was left about where we started.

"Q. Was there any subsequent conference? A. None until after the suit was started."

Potter and Hayden deny that any counter-proposition was made.

Pursuant to this conference, Thomas Page sent to defendant an order addressed to the milling company directing it to deliver the motor to defendant, and containing the following recital:

"It is agreed that the power company will put the motor in first-class order, returning the same to its present location ready to be hooked up to the mill."

David Page testified further, as follows:

"Q. What was the inducement for them to repair the motor? A. To get us back as customers.

"Q. At one cent per kilowatt? A. It was up to them.

"Q. You were not buying current at one cent per kilowatt from anyone except this company? A. No, sir.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. That is your only explanation, that they wanted to get your custom? A. Yes, sir.

"Q. At one cent per kilowatt. Now you say, Mr. Potter did say that they wanted to have a rate of cost plus ten per cent? A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. And you would not agree to it? A. No, sir.

"Q. You would not agree to anything but one cent a kilowatt? A. No, sir.

"Q. Did Mr. Potter take the motor and have it repaired? A. Mr. Potter didn't agree to anything.

"Q. But immediately after the talk, you sent the motor out? A. We didn't agree to anything, and Mr. Potter didn't agree to anything. If they wanted to accept that in pursuance of our conference, it was up to them."

On February 8, 1919, defendant wrote plaintiff asking for a check for its account. On February 11 plaintiff replied, asserting it had overpaid for July, August and September, 1918, in the sum of $470.98, and concluding as follows:

"Inasmuch as we have a further account against the Manhattan Gas & Electric Company for interruptions of current compelling shut-downs in the mill during the months of July, August and September, 1918, as well as for the permanent shut-down compelled by the burning out of the motor until we had procured and installed a new power plant, we do not consider that we owe you anything to be paid at this time."

On February 20, 1919, plaintiff wrote defendant as follows:

"We have now in view some additions to the Manhattan Mill power plant which entail a fair sized expenditure and so do not desire to make commitments on this matter if it is your purpose to comply with the contract for power entered into by your company and the Manhattan Mill. . . .

"In order that we may have a definite basis to work on we desire you to telegraph us immediately whether you will or will not comply with your contract. So far, we have no definite commitments as to what you intend to do in relation to this contract, and we consider we should have this definite word from you before taking steps to protect our interests in other directions.

"Needless to say this matter between us can be settled more satisfactorily now, if you intend to furnish current, than later."

Defendant responded by letter dated February 28, 1919, the following portions of which are material:

"The Manhattan Gas & Electric Company made, as I supposed a definite verbal new contract with you and Mr. Thomas Page on January 19th last, when Mr. Hayden and myself were at Topeka, to the effect that we were to take out, repair and install the burned out motor. You were to pay without further delay, your past due account of approximately $1,016.96, and we were to furnish power through these motors when and as required by you at the station cost of current plus ten per cent.

"Pursuant to this new deal, you gave an order to your people at Manhattan to turn the motors over to us for the purpose of repair and to reinstall, and we proceeded promptly to ship them for repair.

"In order that you may have the definite information asked for in your letter of 20th inst and telegrams, we are ready and willing to comply in every way with our new deal and contract with you above stated of January 19th . . . We shall expect payment of your account."

This letter was not answered and the record discloses no further communication between the parties, oral or written, until November 11, 1919, when David Page questioned the power cost basis of the bill rendered for power from September 29 to October 31. When confronted with this letter, Page finally said he meant "power charge" but on March 20, 1920, in a letter to defendant complaining of service on a single day, when a gale was blowing, he said:

"Then again, your power cost last month was figured on the basis of 2¾¢. I do not know another power company in the West that has the nerve to charge this price for the character of service we have been given. We are considering the installation of a Diesel or Semi-Diesel unit to supply ourselves and some other consumers in Manhattan, as I am quite sure there will be a market for power in Manhattan at a satisfactory and remunerative price."

The bills rendered to plaintiff for July, August and September, 1919, were paid by a check for $1,649.77 dated September 30, 1919, and marked "Paid under protest." In March, 1920, plaintiff quit paying. On July 10, 1920, defendant served written notice that if payment were not received by July 17, service would be discontinued, and after August 12 the contract would be terminated. On July 15, the plaintiff commenced this action for specific performance of the contract of 1916, for claimed overcharges "paid under protest," and for damages.

The court returned the following finding of fact:

"That while there were negotiations between the plaintiff and the defendant . . . to change and modify the terms of said contract in respect to the price to be charged per kilowatt hour for electric current delivered by defendants to plaintiff's mill; the court finds that the minds of the parties never met, and

that no contract, either oral or written, was ever entered into by the plaintiff, the Manhattan Milling Company, with the defendant, wherein or whereby the price to be charged for electric current was to be in excess of that provided for in the contract and as finally determined in the test run made under the terms of said contract, to-wit, 1.1648 cents per kilowat hour for current delivered."

As indicated there was evidence to support the finding and it must be accepted.

The court did not find and could not find that defendant repaired and reinstalled the motor pursuant to an offer by plaintiff to consider modification of the contract if renewed service were demonstrated to be satisfactory. Defendant's testimony that no such offer was made may be left at one side. Page said he did not agree to anything and Potter did not agree to anything, at the last conference before suit was commenced, and the conference left the parties as widely apart as they were before. Page, however, had made himself clear. He insisted on the pound of flesh nominated in the bond of 1916, and would make no change in the pre-war rate until forced to do so. Neither would he consider later the subject of change except on stated conditions. He had paid the plaintiff nothing since September, 1918, and on February 11, 1919, he made his position unmistakable by claiming overpayment for July, August and September, 1918, by denying plaintiff owed defendant anything, and by tacit threat of a damage suit.

Page immediately considered an addition to the mill's power plant. He concluded, however, he would first get a definite commitment from the defendant as to whether or not it intended to comply with the old contract, and he got it. He said he wanted a definite basis to work on, and it was better to settle the matter then than later, an attitude which the law relating to involuntary payments, commends. He received a categorical answer, in unequivocal and perfectly understandable terms.

Without any warrant of fact for so doing, Page chose to treat defendant's answer lightly. He testified he thought defendant was jockeying. He could not bind defendant by what he thought, and in any event, what he thought is not material. Whether or not defendant would furnish electric current at the contract rate was still, from his standpoint, just where he said it was after the January conference, that is "up in the air." He still had no commitment of defendant to anything as a basis to work on, but the asserted new contract for cost, plus. In fact, Page and his witnesses made no pre-

Milling Co. v. Gas & Electric Co.

tense they ever had any intimation from defendant that it would go back to the contract of 1916, and the bill for the first month's service, after the motor was reinstalled on July 1, 1919, was not in accordance with that contract, but was computed on a cost, plus, basis. The bill was not paid. The bill for the second month's service computed on a cost, plus, basis was rendered and was not paid. The bill for the third month's service computed on a cost, plus, basis was rendered. The three bills were then paid by one voucher check, bearing the words, "Paid under protest." Of course, protest was a mere gesture unless there was duress in fact, and in that event, protest was unnecessary.

Page and his witnesses did not testify that discontinuance of service was actually threatened before the 1919 bills were paid, or that they actually feared service would be discontinued if the bills were not paid. We have, therefore, a situation in which defendant merely possessed a means of coercion should it choose to employ it, but coercion was not certainly and presently impending. How did that situation come to exist? The answer is, by plaintiff's voluntary election made when it was on equal terms with defendant and with full knowledge of all the possible consequences.

When the repaired motor was brought to the mill for reinstallation, defendant had not only given no sign of receding, but had commenced in April to charge for current on the cost, plus, basis. Page knew then just what power his steam plant could deliver. He testified he could not get coal. He knew from the experience of the year before just what his situation would be when the milling campaign following harvest commenced. He could not have forgotten his distress in 1918, when in fear lest his power should be switched off, he submitted under protest to an illegal and unjust increase in rate, in order to keep his mill running. With all this knowledge and with his relations to the defendant in the state of uncertainty and hostility in which they had remained since February, he permitted the motor to be installed, disconnected his steam plant, and commenced to operate his mill with electric energy supplied by defendant.

It is elementary that the law does not recognize privilege to pay an illegal demand and then to sue for the money. It is only when, in an emergency for which he is not responsible, a person finds he has no choice except to pay in order to protect his business interests, that he may recover. If, with knowledge of the facts, he voluntarily

46—115 KAN.

takes the risk of encountering the emergency, the payment is voluntary. In this instance, there had been open antagonism between the parties for a full year respecting rate. When renewal of service was about to take place without any composing of differences, plaintiff was called on to choose whether or not it would again place itself in defendant's power. It decided to do so and must abide the consequences.

Plaintiff's superintendent testified plaintiff was glad to get renewal of electric service. If insufficiency of the steam plant and inability to get coal dictated the policy of taking electric current under peril of having to meet defendant's exactions, the principle applies which this court approved in *Kelly v. Miami County*, 85 Kan. 38, 116 Pac. 477. An unjust or illegal demand must be resisted at the threshold, because payment under protest may not be employed by way of strategy in dealing with an adversary.

The petition alleged the overcharge of 1918 was $470.98, the amount named in plaintiff's letter of February 9, 1919. Defendant concedes the amount is correct. All subsequent payments were made voluntarily, and the district court is directed to modify its judgment accordingly.

As modified, the judgment is affirmed.

JOHNSTON, C. J., not sitting.