**TEXAS POWER & LIGHT CO. v. DOER-
ING HOTEL CO.**

No. 8924.

Court of Civil Appeals of Texas. Austin.
Jan. 29, 1941.

Rehearing Denied Feb. 19, 1941.

Burford, Ryburn, Hincks & Charlton and Logan Ford, all of Dallas, and Cox & Brown, of Temple, for appellant.

Lee Curtis, of Belton, and Stahl & Sohn, of San Antònio, for appellee.

BAUGH, Justice.

Suit was by the Doering Hotel Company, a private corporation, against the Texas Power & Light Company, a public service corporation, to recover for over charges and discrimination on electric current furnished the former by the latter corporation at Temple, Texas, during the period from 1928 to 1938. Trial was to a jury on special issues, all of which were answered in favor of appellée, plaintiff below, and judgment rendered against appellant for $14,467.50; hence this appeal.

Frank A. Doering built the Doering Hotel in Temple, Texas, in 1928, and owned and operated it in his individual capacity until 1935, when it was incorporated, and thereafter operated as a corporation. It will be hereinafter designated, for brevity, as the Doering. In 1928 he entered into a written contract with the Texas Power & Light Company (for brevity hereafter referred to as T P & L) to furnish current for power and lighting in the operation of the hotel. Claims of overcharges and discrimination were made by Doering in 1931, and in June of that year an adjustment was made whereby T P & L allowed Doering a credit of $2,758 on his account. Again in May, 1932, upon similar complaints, T P & L again allowed Doering another credit of $1,876.90.

This suit was filed in May, 1938, and tried upon a first amended original petition filed in January, 1939, the claim of overcharge and discrimination covering the period from March 30, 1928, when the original contract was made, to May 20, 1938. The basis of the cause of action asserted involved two elements: The first

predicated upon the method of metering the current for which the Doering was charged; and the second upon the ground that the Doering was charged a higher rate for current by T P & L than it charged other customers similarly situated, in that such other customers were charged a flat rate of 2 cents per kilowatt hour (hereafter indicated as K W H); whereas, the Doering was charged on what was designated as an L P rate. The latter rate provided for a minimum fixed charge based upon horse power, a rate of 4 cents per K W H until a designated amount of current was used; and thereafter on a sliding scale graduated downward as the total current consumption increased. Under the latter method the charge for the quantity of electricity used by the Doering exceeded the 2 cents per K W H charged other consumers.

The allegations were, and undisputed proof showed, that the transformer, through which the current from the "high line" or power transmission line was reduced or "stepped down" so that it could be used in the hotel, was placed in a vault in the basement of the hotel and no other customers were served through it; whereas, at the Kyle Hotel, also located in Temple and served by T P & L, the transformer was placed on poles outside of the hotel and numerous other customers served through it. In addition to this difference relating to the use of the transformers, the meter used for the Doering was placed outside of the vault, ahead of, or on the power side of the transformer. This resulted in metering the current before it reached, or passed through, the transformer. This method was termed primary metering, and the user thus paid the T P & L for the current lost in the transformer and not used by him. In the case of Kyle Hotel and some other large users of electricity furnished by appellant, the meter was placed behind the transformer, and this method was termed secondary metering, in which the T P & L absorbed the transformer loss, and the customer was charged only for the current actually used by him. This situation presented the basis for the Doering's claim: first, an alleged discrimination by appellant between the Doering and other consumers similarly situated, or having similar "material billing factors" in rate charged for the current actually used; and, second, that the Doering was required to and did pay for the current lost in the transformers;

whereas, other consumers similarly situated did not.

The appellant herein, in addition to general and special exceptions and general denial, defended on the grounds: (1) That when the Doering Hotel was built Doering had requested that the transformer for his current be placed in the vault of his hotel; that as a result no other users of current could be served through it, thus requiring that an entire bank of transformers be set aside to his particular use; and that in such cases the uniform custom and practice of utility companies was to meter the customer primary instead of secondary; (2) that over such period of ten years, Doering, with knowledge of all the facts, had paid his bills voluntarily, and therefore could not now recover; (3) that in the adjustments and credits allowed Doering in 1931 and 1932 for discriminations and overcharges, Doering had released all the claims he now asserts for discriminations and overcharges occurring prior to the last date of settlement in May, 1932; (4) that his asserted claims were barred by the two and four-year statutes of limitation.

By supplemental petition Doering alleged that the 1931 and 1932 settlements did not cover nor include discriminations against him resulting from the different methods of metering; and that subsequent to the May, 1932, settlement and contrary to appellant's written contract with him, contrary to the law against discriminations between consumers of electric current, and contrary to the express assurances of appellant's officers and agents then made that no further discriminations would occur, such discriminations were continued; and that appellant did not discover, and could not by the use of reasonable diligence have discovered, this fact until the year 1936. And by trial amendment Doering further pleaded that during the period of time involved in this suit he paid the sums demanded of him by appellant for fear that appellant would cut off his current if he did not.

Due to the fact that the Doering Hotel was, for a part of the time involved, in the hands of a receiver, the special issues submitted applied in part to different periods of time between March 30, 1928, and May 20, 1938; but we do not deem it necessary to segregate these periods here. In so far as the issues presented are concerned the material findings of the jury

may be summarized as follows: They found

1. That between 1932 (the year in which the last settlement between Doering and appellant was made) and May 20, 1938, T P & L furnished to other consumers situated "in so far as their material billing factors are concerned" under the same or similar circumstances that Doering was, at a flat rate of not exceeding 2 cents per K W H.

2. That after the 1932 settlement and prior to May 7, 1936, Doering failed to discover that he was being so discriminated against.

3. That he could not, by the exercise of ordinary prudence during such period, have discovered such facts.

4. That the officers and agents of appellant had, at all times subsequent to the 1932 settlement, whenever the matter of rates was discussed, assured Doering that he was being given the best rate available to consumers of his class.

5. That Doering believed and relied upon such assurances.

6. That during said 10-year period T P & L furnished current to other customers similarly situated in so far as material billing factors were concerned, which it metered secondary.

7. That Doering did not prior to May 7, 1936, come into possession of facts which would cause him to believe that he was being discriminated against in this method of metering.

8. That at no time prior to May 7, 1936, did Doering discover that such other users were being metered secondary.

9. That he could not in the exercise of ordinary prudence have discovered such facts.

10. That appellant had furnished other consumers similarly situated to Doering, but metered secondary, a flat rate of not exceeding 2 cents per K W H.

11. That the transformer loss, as between primary and secondary metering, was 10.4%.

12. That such transformer losses were not considered in the 1931 and 1932 settlements between the parties hereto.

13. That Doering did not know when he paid his bills from May, 1932, to March, 1936, that Scott & White Hospital, Scott & White Dairy Farm, and King's Daughters Hospital, all at Temple, were being billed on a flat 2-cent per K W H rate.

14. That Doering did not know prior to May 7, 1936, that the Kyle Hotel was being metered secondary.

15. That during said period Doering and his agents, etc., would not, in the exercise of ordinary prudence, have discovered that the Kyle Hotel was being metered secondary.

Based upon these findings and upon the uncontroverted evidence as to the current consumed by Doering and the amount paid by him therefor, the court rendered judgment in favor of Doering for the amount above indicated, from which T P & L has appealed.

The record presented is voluminous and the manner in which the appeal is presented has made necessary an examination of the entire statement of facts. Except in one or two instances, hereinafter noted, appellant has not by assignment nor proposition attacked specific findings of the jury, either as being unsupported by any evidence, or as being contrary to the overwhelming weight and preponderance of the evidence. Nor is any objection presented on this appeal as to the manner and form in which the fact issues were submitted to the jury. In the main, appellant's primary contention is that there was no evidence to support any of the findings of the jury, and that it was entitled to a judgment in its behalf as a matter of law, non obstante veredicto. We shall not undertake to discuss in detail the numerous propositions presented in appellant's brief; but have endeavored to give consideration to the material questions embodied in them.

■ Decisions are legion involving rate charges made by public service corporations of consumers of electric current. It is a universal rule that a public utility cannot discriminate in its rates or charges between consumers similarly situated. Art. 1438, R. C.S.1925, makes it unlawful for a public service corporation to do so. See, also, El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 108 A.L.R. 744; 34 Tex.Jur., § 17, p. 719; 51 C.J., §§ 16 and 61, pp. 7 and 29; 9 R.C.L., § 11, p. 1196. In view of the statute and of this universal rule, a written contract with a consumer requiring him to pay a higher rate or charge than the corporation collects from others similarly situated is of no avail to the corporation, if in fact and in law such contrac-

tual rate or charge is discriminatory. Texas Power & Light Co. v. Hilltop Baking Co., Tex.Civ.App., 78 S.W.2d 718; 20 C.J., § 30, p. 336.

■■ It is likewise well settled that such a corporation may make a reasonable classification of consumers based upon a material difference in the type and quantity of service furnished, and charge a different rate as between such classes. But as between the same class of consumers, where it has a published rate applicable thereto, it is not authorized to differentiate between them in its charges. In the instant case the T P & L does not appear to have had published rates, based upon separate classifications made by it of the various industries and institutions situated in Temple or in that area, which placed the Doering Hotel for rate purposes, in a different classification from such other industries and institutions; and which Doering claimed were similarly situated but were charged less for the same or similar service to that furnished his hotel. There being no fixed classifications as between them, and no published rates made by appellant as applicable to differing classes, the question of whether or not the institutions and industries in Temple and in that area, served by T P & L, and charged for such electric current on a different basis from the charge made against Doering, were similarly situated to the Doering in so far as "material billing factors" were concerned, presented a fact question. Western Union Tel. Co. v. Call Publishing Co., 181 U.S. 92, 104, 21 S.Ct. 561, 45 L.Ed. 765, at page 771. The jury having found, in answer to the issues submitted, that other consumers in this area, of whom T P & L had collected a lesser rate for the current furnished them, than it had exacted of Doering, were similarly situated to the Doering Hotel, discrimination necessarily resulted, if such findings find support in the evidence.

■ Since the appellant contends that there was no evidence to support such fact findings of the jury, we are to be guided by the oft-repeated rule that the appellate court will disregard evidence to the contrary and look only to that in support of such finding.

In the light of what has already been said, we now consider the contentions made by appellant. The first eight propositions, though variously stated, present the contention that because a transformer was allocated to the exclusive use of the Doer-

ing, at extra expense to the T P & L in doing so, and gave him a better service than other consumers received where several were served through the same transformer, the company was entitled to charge him a higher rate; and that metering the Doering primary instead of secondary in effect merely accomplished that result. And further that it was the universal custom and practice of appellant, and of all other public utilities to meter the consumer primary where a transformer was allocated to his exclusive use.

■ It is well settled that where a particular consumer is furnished a type of service, requiring additional expense to the utility company, superior to that furnished other consumers, the company may exact of such favored consumer a higher charge therefor than it collects from those less favored. The test, in determining whether the service is rendered "under similar or like circumstances" within the meaning of the statute, is to ascertain whether the "material billing factors" on which the rate is based are substantially the same. And in determining this question it is not essential that the consumers be competitors or that they be engaged in the same character of business. It is not uncommon in the classification of consumers and the publications of rates applicable thereto for utilities to include in the same class and under the same rate schedule, business enterprises and institutions engaged in wholly different undertakings, but having the same material billing factors. These factors were recognized by both parties hereto as controlling in fixing rates to be charged. They include similarity, from the standpoint of the utility, of the service rendered, such, for example, as the volume of the current required, the cost to the company in furnishing it, when the peak of the load occurs, the constancy and regularity of the use made by the consumer, and other similar circumstances.

■ While the transformer through which current was furnished to the Doering was installed in a vault in the basement of the hotel, and only the Doering served through it; in the case of the Kyle Hotel, also located in Temple, a transformer of similar capacity was suspended on poles outside of the hotel and other consumers than the Kyle served through it. But there was evidence from which the jury could have concluded that the Doering transformer was installed in the

vault of the hotel at the request of and for the benefit of the T P & L; that it constituted a greater fire hazard to Doering there than if it had been placed outside as was done at the Kyle; that it was contemplated at the time of the installation that the Doering would require for its own use its full voltage capacity, and consequently that other consumers could not, as was true of the Kyle transformer, have been served through it had it been placed outside of the hotel; and that the Doering did not receive any special benefits from such installation. If the added cost of such installation was for the benefit of the company, and for the protection and preservation of its machinery against loss or injury from the elements and exposure, and resulted in no benefit to the consumer, the company could not properly use such added cost as a basis for a higher rate than if it had placed the transformer on poles outside of the hotel as it had a right to do. While appellant, based upon the testimony of its witnesses, strongly insists that Doering did receive special benefits, since the only attack made on the findings of the jury is that there was "no evidence" to support them, we need look only to the evidence in support of such findings. Hall Music Co. v. Robinson, 117 Tex. 261, 1 S. W.2d 857.

On the issue of the uniform custom to meter consumers, allocated the exclusive use of a transformer, on a primary basis, there was evidence to show that the appellant itself had other consumers in Temple and its immediate area to which it had allocated a transformer, but metered secondary; and which the jury could have found were similarly situated to the Doering. Among these were the Scott & White Dairy, the Santa Fe Hospital at Temple; the Allen Ice Company near Belton; the Hilltop Baking Company and Amicable building in Waco; and the Peoples National Bank at Tyler. While one of appellant's witnesses testified that if the transformer at the Doering had been placed outside the hotel, as was that at the Kyle Hotel, 34 other customers could have been served through it; it was shown that at the time the Doering transformer was installed appellant itself estimated that the Doering alone would consume all the voltage that the transformer could safely carry. There was also testimony to show that this transformer was under the complete control of appellant and that, if its capacity permitted serving other customers

than the Doering through it, appellant could, without unreasonable expense, have done so by running a conduit out of the vault for that purpose, just as was done in running one from the high line into the vault.

■ Appellant's ninth proposition is that "There is no evidence of any probative force in the record that the transformer loss equals 10.4% of the current consumed at the Doering Hotel."

While not so designated we take this as a direct attack on special issue No. 16 submitting such inquiry to the jury, in answer to which they found the transformer loss occasioned by primary metering to be 10.4%.

The proof on this issue consisted of the testimony of experts, the qualifications of none of whom are attacked, based upon tests made and highly technical methods of computation. One testified in behalf of Doering and three in behalf of appellant, one of whom was one of its employees. In the last analysis, appellant's argument resolved itself down to the contention that the methods and tests made by its experts in computing such losses were correct; and those used by appellee's witness were wrong. All agreed that the transformer loss consisted of two elements: one, a core or iron loss of current which was continuous and constant,—that is, the transformer consumed a continuous quantity of current whether the hotel was using any current or not. The other was designated as a copper loss which increased in a geometric ratio with the increase in the amount of current used by the hotel, but was nil when the hotel used no current. The test used by Doering's witness in determining the iron or core loss was made by appellant's employees by cutting off the hotel current entirely for a given period, and reading the meter by which Doering paid his bills. This he found to be 6% of the average current used by the hotel. The tests on which appellant relies were made on instruments brought from A. & M. College by one of its professors; and his computations were based thereon. His losses were estimated to be much less than 6%. The same was true of estimates of the copper losses. Each witness based his calculations and estimates upon what he considered recognized and approved engineering methods and standards of computation, with result that the estimated losses varied from 3.96% to 10.4%. Each witness was

cross-examined in detail as to the methods used by him, and the factual bases on which he reached his conclusions. The jury consequently were entitled to take all these matters into consideration, the interest of the witness, the manner and circumstances under which he made his tests, and to draw their own conclusions as to amount of the current so lost in the transformer. That being true, and there being evidence to sustain such conclusion, it will not be disturbed on appeal.

■ Appellant's next contention is that in computing transformer losses an improper measure of damages was allowed. The assertion is made, though the judgment itself does not disclose it, that appellee was awarded $4,665.36 for this item. The gist of the contention is that in such cases there are two elements of damage; one for overcharge, where, for instance, a consumer is charged more than a fixed or applicable rate; and the other where, absent a fixed or published class rate, he is charged more for his service than the ·utility charges others similarly situated. And that in the latter case, the amount of his recovery is not fixed merely by the difference caused by the methods of metering, citing numerous cases from other jurisdictions. However that may be, the same issue, in substance, was presented in Texas Power & Light Co. v. Hilltop Baking Co., Tex.Civ.App., 78 S.W.2d 718, approved by the Supreme Court in El Paso Electric Co. v. Raynolds Holding Co., supra, where the measure of damages allowed was the difference between the rate charged and the one which should have been charged. Based upon these cases the contention is overruled without further discussion here.

Propositions 11 to 16 variously present the contentions that the amount of the recovery, not set out in the judgment itself, but asserted by appellant to be $5,-649.25, based upon the difference between the L P rate (the rate charged Doering) and the flat 2-cent per K W H rate was error. This in large measure is based upon the contention, in addition to those already considered, that there were such substantial differences between the Doering, charged on the L P rate, and the Scott & White Hospital, Scott & White Dairy, which was separately owned and operated by others than Scott & White, and the King's Daughters Hospital, as to authorize a differentiation of rates between

them. These propositions but present different factual considerations and distinctions between the enterprises named which might have sustained different classifications for rate purposes, but which the T P & L itself had not made and published. They are, in effect, but attacks in general, without specific reference thereto, upon the findings of the jury that such institutions, in so far as their material billing factors were concerned, were similarly situated to the Doering, a fact issue determined against appellant by the jury upon sufficient evidence to sustain their findings. Even the assistant rate engineer for appellant, and one of its witnesses, testified that between 1928 and 1938 appellant had no published schedule applicable to hospitals giving them a 2-cent per K W H rate; and that "the larger hospitals were on hotel rates with the exception of this one here." That there were no T P & L rates available to hospitals that were not also available to hotels.

■ Appellant's seventeenth proposition urges in substance and effect that Doering knew from 1930 on that he was being discriminated against; and that notwithstanding this knowledge, he continued to voluntarily pay such excess charges, and is not therefore entitled to recover them. This contention is not sustained. In it the appellant in effect admits that beginning in 1928 it was charging Doering on L P rate metered primary; that up to September 1, 1930, it was charging the Kyle Hotel, the Scott & White Hospital and Scott & White Dairy on a flat 2-cent rate, metered secondary, a lower rate; that it was charging the King's Daughters Hospital on a 2½-cent per K W H rate. In brief, that it had in Temple no consumer classification covered by a published rate applicable thereto, but was fixing rates, not uniformly, but by contract with the individual consumer. In 1930, because of Doering's protests, it placed the Kyle, a competing hotel, on the L P rate, but metered secondary. In 1931 and again in 1932, it adjusted Doering's accounts with it, on the basis of a flat 2-cent rate. A new manager took charge of the company's office at Temple, and the president of T P & L came from Dallas to confer with Doering, and then assured him that thereafter he would receive the best rate available and, in effect, that no further discrimination would occur. Doering testified that the 1932 adjustment was made

on the basis that he was entitled to the same rate applicable to hospitals; and that the Kyle, then owned by Scott & White, the Scott & White Hospital and the Dairy farm, then owned by Dr. Scott, were being serviced under one contract. Appellant's rate engineer also testified that the same rate was available to hotels and hospitals alike. Doering consequently had a right to assume, after the 1932 settlement, that the hospitals were being billed on the same L P rate that he was. He testified that he did not know otherwise until 1936, when he was so advised by a rate investigator, and then began his efforts which resulted in this lawsuit. In answer to special issue 19, which is not specifically attacked by assignment, the jury found under these circumstances that from 1932 to 1936, Doering did not know that the hospitals and the dairy farm were still being billed at a 2-cent rate. In view of the foregoing, the fact that the company's manager and other officers had continuously advised him that he was receiving the best rate available to him; that there was no published 2-cent rate applicable to hospitals as a class, but that same was "a secret unpublished rate," it is manifest that there was evidence to sustain the finding of the jury on the issue submitted. And the contention made is in effect nothing more than that there was no evidence to sustain such finding.

The contention of voluntary payment with knowledge of all the facts must, under the jury finding, therefore fall.

It may be doubted whether the issue of duress is here involved. The payments made appear either to have been made under a mistake of fact rather than under mistake of law; or to have been induced under the representations of appellant's officers and agents amounting in law to a fraud upon the consumer. But if duress be involved, it would appear that Doering paid under implied, if not express, duress. Generally one paying money where the payee would be compelled to resort to the courts to collect cannot defend on the ground of duress in such payment. 32 Tex. Jur., § 49, p. 729. But where the payee has the power to enforce such payment, or on failure to pay, to work great financial loss, business disadvantage, or irreparable injury to the payor, duress occurs, even though it be not actually attempted to be exercised. Appellant had the power, under its contract with Doering, to cut off his

service for nonpayment of its demand, and thus paralyze his business. Nonpayment by him necessarily invoked that potential hazard. In such case, the Supreme Court has held in Austin National Bank v. Sheppard, 123 Tex. 272, 71 S.W.2d 242, and in National Biscuit Co. v. State, 134 Tex. 293, 135 S.W.2d 687, 692, that in the face of such existing power, payments so made are made under implied duress even though the payor did not make them under protest. See, also, Edwards v. Williams, Tex.Civ.App., 93 S.W.2d 452; Ward v. Scarbrough, Tex.Com. App., 236 S.W. 434. And this rule has been held to be applicable to public utility corporations in illegal exactions against their consumers. Manhattan Milling Co. v. Manhattan Gas & Electric Co., 115 Kan. 712, 225 P. 86, 34 A.L.R. 176, and annotation at page 185; 17 Am.Jur. § 8, p. 880.

Appellant next contends in propositions 18 to 22 that all items sought to be recovered by Doering, paid by him more than two and four years prior to filing of his suit, were shown, as a matter of law, to have been barred by limitation. Here again appellant undertakes to attack the several findings of the jury on special issues submitted without challenging by assignment any specific issue. Appellee based its cause of action not only upon the duty imposed upon appellant both by common law and statute not to discriminate as between consumers similarly situated; but also upon appellant's written contract with it providing that the rates therein specified should be subject to change, but if so such new rate would be "in accordance with such rates as the company may in the future establish for others for service of a character similar to that which it herein agrees to furnish, etc." Thus appellee had a written contract providing, in effect, against discrimination; and any breach thereof would, of course, be referable to the four-year statute of limitation. See Art. 5527, R.C.S.1925. The contract was cumulative of the statute. Kohfeldt v. City of Denison, Tex.Civ.App., 58 S.W.2d 549. Suit was filed in May, 1938, and the jury found that Doering did not discover, and in the exercise of ordinary prudence could not have discovered, prior to March, 1936, that he had, after the 1932 settlement, continued to be discriminated against. From what has already been said, and without summarizing further the testimony here, we think the evidence was clearly sufficient to sustain such findings. After the 1932 set-

tlement at which time, and repeatedly thereafter, Doering was assured that he had and would have advantage of the best rate available, he had a right to rely on such assurances; and was not required to make investigation to see whether appellant was by private contract charging other consumers similarly situated on a different "secret unpublished rate" a less amount. El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 108 A.L.R. 744.

Appellant next contends that the judgment in allowing appellee recovery for transformer losses, and in addition the difference between what he paid on the L P rate and what he would have paid on the flat 2-cent rate for his current, allowed him to make a profit, at appellant's expense, of $2,909.30. We fail to see how this could be. Recovery for the transformer loss was but for the moneys paid for current metered to appellee which it did not receive; and recovery of the difference, the actual amount of current billed to appellee not being disputed, between what Doering paid for the current he actually received and used, and what he should have paid under a flat 2-cent rate, was merely a matter of calculation. And as we understand the record, this is what the court awarded in its judgment.

██ Nor does the judgment in allowing a recovery to Doering on a flat 2-cent rate, instead of on an L P rate, work a discrimination against others, if the method of metering be disregarded. The mere fact that the Kyle Hotel, metered secondary, was billed and paid on the L P rate, would not defeat Doering's right to a 2-cent rate, if, as found by the jury, other consumers similarly situated were being given a flat 2-cent rate. If two consumers, similarly situated, are being charged a discriminatory rate as compared with other consumers also similarly situated, discrimination against one is no justification for a discrimination against the other.

██ Appellant also contends that the court erred in allowing as damages 6% interest on each monthly overpayment computed from the date each payment was made over the ten-year period, because the measure of damages was "not fixed at any particular time"; or that in any event the matter of recovery of interest should have been submitted to the jury. Neither contention is sustained. The cases primarily

relied upon by appellant are Main Realty Co. v. Blackstone Valley Gas & Electric Co., 59 R.I. 29, 193 A. 879, 112 A.L.R. 744, and Watkins v. Junker, 90 Tex. 584, 40 S.W. 11, the former case being urged as directly applicable. In that case, however, the utility company refused to furnish the plaintiff power at wholesale rates to be resold by him to his own tenants at retail rates. His suit was for contemplated profits he alleged that he would have made in the resale by him of the current to his tenants had it been furnished; manifestly a question not presented here.

In its petition plaintiff prayed for interest on the overcharge. While there are cases in which it is left to the jury, under proper instructions to determine whether interest is to be recovered as a part of the damages (see 13 Tex.Jur. § 145, p. 257), it is now a settled rule in Texas that where damages are established as of a definite time and the amount thereof definitely determinable, either by written instruments or by fixed rules of evidence and known standards of value, interest is recoverable as a matter of right from the date of the injury, and it is not necessary to submit the question to the jury. The court may award such interest in its judgment. Texas & N. O. R. Co. v. Dingfelder & Balish, 134 Tex. 156, 133 S.W.2d 967; Ewing v. Wm. L. Foley, Inc., 115 Tex. 222, 280 S.W. 499, 44 A.L.R. 627; Joy v. Peacock, Tex.Civ. App., 131 S.W.2d 1012; El Paso Electric Co. v. Raynolds Holding Co., supra; 25 Tex.Jur. § 142, p. 253. The amount of the overpayment each month during the period of time involved was definitely ascertainable by mere mathematical calculation from the bills rendered to Doering and paid by him, thus coming clearly under the rules announced in the above-cited cases. The interest recovered was therefore properly allowed.

Appellant next contends that it was error for the court to fail to define the term "material billing factors" as used in the special issues submitted to the jury; and that the issues so submitted were duplicitous and multifarious in that such term or phrase included a number of different factors.

██ Under Art. 2189, R.C.S., and numerous decisions, it is now settled that the court should define or explain such legal terms as may be necessary to enable the jury to render a proper verdict. Ordinar-

ily definition by the court of the phrase in question would, we think, have been appropriate. We have reached the conclusion, however, that, granting that it should have been defined, no injury could have resulted to appellant in the instant case from the failure of the court to do so. The statute forbids discrimination between consumers "in the charge for such * * * electric current or power, or in the service rendered under similar and like circumstances." The chief controversy presented in the instant case was whether the Doering was served under similar and like circumstances. That was the ultimate fact issue to be determined by the jury. The elements or factors applicable in determining this ultimate fact issue constituted the mayor portion of the inquiry involved in the 750 pages of the statement of facts and the four additional volumes of exhibits. In its determination it was recognized and admitted by both parties that the similarity, or common "material billing factors" applicable to the various consumers involved, was controlling. When a rate expert witness for appellee was testifying, he was asked "what billing factors" should be taken into consideration in determining the rate schedule applicable to consumers. Thereupon appellant's counsel objected to this question on the ground it presented a question of law, and the trial court interposed the statement, "I don't see how the jury can pass upon some issues without knowing what is billing factors." Counsel then stated: "That will be a matter of instruction in your legal definition," and the court replied: "I would like to know myself. Overrule the objection." The witness thereupon outlined in detail the factors or elements to be considered in arriving at a proper rate, such, for example, as regularity and uniformity of usage; the power required to carry the needed current; the number of K W H used during the month; etc. The rate expert witness for appellant substantially confirmed these elements as going to make up the billing factors; and the similarity as between the Doering and other consumers involved, in respect to these particular elements, was the subject of the interrogation, both direct and cross, of the expert witnesses of both parties. Counsel for both parties, in interrogating the witnesses, repeatedly referred to such matters, whether they be called elements, facts, circumstances, or factors, as constituting "billing factors" to be considered in determining whether the Doering

and the other consumers under investigation were similarly situated for billing or rate purposes. Manifestly the jury were fully advised of the elements or facts involved in "billing factors" and any definition, if same were necessary, undertaken by the court would not have given them any additional understanding of the term used.

This same issue was involved and the same phrase used in Texas Power & Light Co. v. Hilltop Baking Co., Tex.Civ.App., 78 S.W.2d 718, writ dismissed, but the opinion of the Court of Civil Appeals does not discuss it. Statement is made, however, in appellee's brief that appellee has examined the application for writ of error in that case, and that in such application the same question here involved was presented both to the Court of Civil Appeals and to the Supreme Court, and though not discussed was necessarily overruled.

■ Nor did the use of this phrase in the issues submitted to the jury render such issues duplicitous. As stated, the ultimate fact issue was whether the Doering was in fact similarly situated to other consumers who were admittedly charged a different rate. This fact issue involved several factual elements necessary to be grouped together, or considered collectively, as composing the billing factors. That is, they were merely constituent elements of the ultimate fact to be found. It is now settled that such a submission does not render the issue duplicitous. Rotge v. Dunlap, Tex. Civ.App., 91 S.W.2d 905; Hunter v. B. E. Porter, Inc., Tex.Civ.App., 81 S.W.2d 774; Levy v. Rogers, Tex.Civ.App., 75 S.W.2d 304; Texas Employers' Ins. Ass'n v. Rowell, Tex.Civ.App., 104 S.W.2d 613.

■ Appellant also complains that the argument of one of appellee's counsel to the jury in discussing the L P rate charged Doering that: "Some of us think it is the long prod, and that is what Frank Doering got," was prejudicial and should require a reversal. No objection was made to argument at the time and no request made that the jury be instructed not to consider it. Under the circumstances, even if deemed improper, it was manifestly harmless. The exhibits in evidence were placed upon an easel before the jury and a billiard cue used as a pointer to explain them to the jury. The court's qualification shows that the remark was made facetiously, and could as well have conveyed the idea to the jury that Doering had been prodded into paying the

higher rate from the Dallas office of appellant, /as that which the appellant now seeks to attribute to such remark. In any event, it was first raised in a motion for a new trial, and the trial court with knowledge of all the circumstances under which it was made, and in his discretion, decided that no injury to appellant resulted. We find no abuse of his discretion in the matter.

The same may be said of the argument complained of·in which said attorney stated that the power company could very well be called the high power company; that it had high powered engineers and lawyers and high voltage losses they had put to Frank Doering; and that they had plenty of ability across the table from appellee's counsel. This argument, in the light of all the facts and circumstances, falls far short, we think, of being of such prejudicial nature, if conceded to be improper, as to require a reversal under the rules set forth in numerous decisions and summarized in 41 Tex. Jur., §§ 77 and 78, p. 801.

■ Finally, appellant complains of the failure of the trial court, as requested in objection No. 129 to the court's charge, to instruct the jury in writing to disregard certain testimony which the court had excluded and had orally instructed the jury not to consider. A reference to the transcript shows that this objection No. 129 contains subdivisions a to v relating to numerous items of evidence, some of which had been admitted without objection, and some of which the trial court had orally instructed the jury not to consider, the exact testimony complained of not being set out. No special instructions were drawn by appellant and presented to the court to be given. All these requests were presented together under a single paragraph, and some of them appellant was not entitled to have given. On this appeal, only two of them are urged, the others having been abandoned. Under such circumstances, it was not incumbent upon the trial court to search through such list and ascertain which should and which should not have been given; and he properly refused them all. Travelers' Ins. Co. v. Hunter, 30 Tex.Civ.App. 489, 70 S.W. 798, writ refused; Bewley Mills v. First Nat. Bank, Tex.Civ.App., 110 S.W.2d 201; Vernon's Ann.Civ.Stats. Art. 2186, Note 31.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

Affirmed.