**TEXAS POWER & LIGHT CO. v. KOUSAL et al.**

No. 2449.

Court of Civil Appeals of Texas. Waco.

Feb. 25, 1943.

Rehearing Denied April 8, 1943.

John Maxwell, of Waco, Logan Ford, of Dallas, W. E. Terrell, of Waco, and Black, Graves & Stayton (on appeal only), of Austin, for appellant.

· George Clark, Harold O. Clark, and John B. Fisher, Jr., all of Waco, for appellees.

TIREY, Justice.

Plaintiffs brought this suit against Texas Power & Light Company, a public service corporation, to recover for unlawful discrimination for charges for electric current furnished to them by defendant during the period from January, 1918 through October, 1938. On the verdict of the jury the court awarded judgment in favor of plaintiffs against defendant for the sum of $7,288.44, with interest at six per cent per annum from January 1, 1941 until paid. The award of $7,288.44 is made up of the following items: (a) The sum of $4,195.79, being the difference between the amount paid over the period in controversy and what plaintiffs would have paid had the F–1 rate been applied to their combined power and lighting loads; (b) interest in the amount of $3,-092.65, ascertained by mathematical calculations from the stipulation in the evidence that each monthly bill was paid on or before the first of the following month. Defendant seasonably presented its motion for an instructed verdict, and thereafter its motion for judgment notwithstanding the verdict, both of which were overruled, and it has appealed.

This action of the trial court is assailed substantially on the ground that the F–1 rate for power and a separate rate for lighting were defendant's established, published and prevailing rates to the public; that such rates were not destroyed or rendered less binding upon the public, individual consumer, or the utility by a few departures from adopted and otherwise universally applied rates.

This point requires a comprehensive statement. Plaintiffs were engaged in operating a retail and wholesale meat market. In addition to the current used for lighting, they used electric motors for operating refrigeration units and other machinery in the conduct of their business. The action is grounded upon a discrimination in the application of the Company's F–1 rate. Plaintiffs alleged "that the F–1 schedule was available to all power consumers having as much as one horse power connected which was operated as much as one hour per week, and the defendant at no time had any other type of F–1 rate available, either to all customers or to any special type of customers in the City of Waco; and the defendant actually represented to these plaintiffs that they were being given the best application of the F–1 rate available, and impliedly represented that it was the

best application of such rate by extending the same to and applying the same to plaintiffs' business without disclosing that the F–1 rate was being extended to other power consumers in the Waco territory both on power and lights. That at the time the defendant began billing these plaintiffs on the F–1 rate as to power and a separate rate as to lighting, defendant represented to plaintiffs as a fact that said billing schedule was the best schedule available upon which to bill consumers of the class to which plaintiffs belonged; and in this connection it is shown to the court that the defendant wholly failed to inform and advise these plaintiffs that other consumers were being billed both as to the power and lighting upon the F–1 rate, and wholly failed to inform plaintiffs that it had extended the F–1 rate to other power consumers within the class of consumers entitled to the F–1 rate both as to power and lighting. That said representations on the part of the defendant and its duly authorized agents were false, and that the action of the defendant in failing to disclose that the F–1 schedule as to both power and lights was being applied to other consumers was fraudulent and in violation of the duty which defendant owed the plaintiffs not to discriminate against them as to rates and service." There was proof to the effect that the F–1 rate (the franchise power rate) was applicable to current used for powering motors and not to current used for lighting and was designed to give a lower average to the larger users and was available to all power consumers having as much as a one horse power connected which was operated as much as one hour per week. From 1918 through October, 1938, plaintiffs were metered and billed for power on the F–1 rate separately from lighting, except that for a period of five months they were metered and billed for all of the current used by them solely on the basis of power under the F–1 rate. There was testimony to the effect that the Light Company had 142,000 customers, 16,000 of which were in the Waco territory.

It was stipulated "that the Texas Power & Light Company has at all times since it began its operation been operating under a franchise with amendments to the franchise in the City of Waco granted by the governing body of the City of Waco." The F–1 rate had been in effect from 1917 down to the date of the trial. It was revised in January, 1917, 1922,

1931, and November, 1935. In the 1917 revision it was designated as "Schedule F–1, Industrial Power-Meter Rate"; in the 1922 and 1931 revisions it was designated as "Schedule F–1, Industrial Power-Optional Meter Rate"; and in the 1935 revision it was designated as "Schedule F–1 General Power Service"; and we find no changes in the revised schedules that are pertinent to the matters in this case. In the 1935 revision there was a clause in the contract under "Application of Schedule" that specifically provided: "Applicable where no specific schedule is provided to alternating current power service of one contract horse power or more and is to be metered and billed separately from lighting."

■ The jury's findings pertinent to the point are as follows: (a) That the Light Company was billing one or more consumers in the City of Waco on the F–1 rate for both power and lights from January, 1918 through October, 1938; that plaintiffs were similarly situated with reference to the written provisions showing the availability of the said F–1 rate to consumers in Waco from January 1, 1918 through October, 1938; (b) that plaintiffs were similarly situated with reference to the service conditions, operating conditions and cost factors determining the application and availability of the F–1 rate to such consumers from January 1, 1918, through October, 1938; and (c) that the billing of some consumers in the City of Waco on the F–1 rate as to both power and lights was authorized.

Plaintiffs relied, in part, upon the testimony of witnesses in the employ of the Light Company to show that said Company discriminated against them in the application of the F–1 rate. The local manager (Williams) testified, in part, substantially as follows: That since 1912 appellant has been the only concern in this territory engaged in the business of generating and selling electric current; that if the customer had as much as a one horse power load and wanted the F–1 rate, he was metered and billed for power on that rate separately from lighting; he identified a letter dated in September, 1921, written by him to The Cooper Grocery Company (one of the eleven), which letter stated in part: "Effective with your meter readings from July 28th to August 29th, we are billing the total consumption of the electricity at your plant under the F–1 schedule * * *";

that he wrote this letter in order to make an adjustment of the controversy that had arisen with reference to the bill for electric current; "didn't anybody tell me to do that * * * I think I just took it on myself"; "when I wrote that letter I exceeded my authority; I did not have any right to change the rate * * * I decided that that was the thing to do and put them on that rate without any authority to do it"; that he did not have anything to do with rates but carried out instructions; that he never did extend the F-1 rate to a customer or apply it in a different manner from the application clause on his own authority; that if he ever did anything with reference to those rates different to what the application clause stated, someone told him to "in writing"; that he put the picture shows on the F-1 schedule; that there is no distinction between power that the Light Company brings into Waco as furnished to its consumers here. "Q. So, if I understand your testimony, you are testifying positively that The Cooper Grocery Company, Western States Grocery Company, Mailander Co., Dr. Pepper Bottling Company, Coca-Cola Bottling Company, Crawford-Austin Manufacturing Company, Interstate Theaters, Clifton Manufacturing Company, the Baptist Sanitarium, the Trautschold Company, the Methodist Orphanage (the eleven), Allen-Morrow Filling Station, Perry Allen Filling Station and Smith Planing Mill ought not to have been on the F-1 rate as to both their power and lights? A. That is correct"; that he knew nothing about the foregoing concerns or the application clause of the F-1 rate that would have justified him as manager, or any other employee, giving the foregoing concerns the F-1 rate as to both power and lights; that he did not know who told the office within the last two years to stop billing those concerns on the F-1 rate as to both power and lights; "Sammons was talking to me about it. Q. Who did he tell you caused the change? A. I do not remember that. He would have to tell you that * * * I will tell you why we changed it. Q. All right. A. Put them on a cheaper rate, as I recall it. Q. You changed it because you were going to put them on a cheaper rate? A. Yes. Q. Is that the only reason you had to quit billing those people on the F-1 rate—that were not entitled to it? A. I can't answer the question that way. Q. I understood you to testify a moment ago, before the recess, that just as soon as—you found out that

those other concerns were on the F-1 rate you said: 'Boys, we have got to quit it.' Did you mean that or not? A. I will stick to that if I made that statement. Q. Is that correct? A. Practically so. Q. I say the reason that you changed wasn't because you wanted to give them a cheaper rate? A. At that particular time I think the question was raised. I am not familiar with the details, but I know when we changed them on the new rate we reduced the rate; that was his idea of doing it"; he said that he had had letters from the Dallas office criticizing him or his office because the F-1 rate had been extended to the customers inquired about, but not the others; these letters were from Mr. Blair, the rate expert and head of the rate department, and from a vice-president of the Company. The witness promised to attach these letters to his deposition, but these letters were not so attached and at the time of the trial the witness was ill and in a hospital.

Mr. Blair testified, in part, substantially as follows: The F-1 rate was established by the City in the ordinance contract; that there was only one F-1 rate at a time and this rate, by its application clause, was not available to any one of the eleven on both power and lights; they did not file with the City Commission any schedule showing that both power and lights were being made available to picture shows on the F-1 schedule; "we told the picture shows about it; the ones that were entitled to it"; that there was nothing on file with the City of Waco apprising the public of the fact that some customers were being billed on the F-1 rate as to both power and lighting; that no suit was ever filed under the Company's contract with the City (procedure for revision and extension), seeking to force it to permit the Light Company to bill the picture shows on the F-1 rate as to both power and lights, nor after the ordinance was adopted the Company never filed with the City Secretary any F-1 rate which, by its terms, was available to any class of consumers for both power and lights; that the F-1 rate was being misapplied to some consumers; that at the end of the five months' period in which the Light Company had billed plaintiffs for both power and lights on the F-1 rate, the Company corrected that mistake and applied the F-1 rate to power and the lighting rate to the lights; that he did not know that The Cooper Grocery Company was on such rate until the study made prior to the time he

established the LP-6 (the LP-6 was made in the early part of 1938 and became effective in June, 1938); that he did not immediately write a letter to the local manager and tell him to take them off of that rate; "I may have written a letter, but I know I talked to him (Williams) about it; Q. How long did you permit them to stay on it after you found out that he had put them on it? A. I don't recall now—not very long"; that he authorized picture shows to be billed for both power and lights on the F-1 rate; "Q. And if I understand you, the idea is that these boys down here have disregarded their instructions and have just stepped out here and discriminated contrary to your knowledge? A. That is right"; "we relied on the local organization to administer all the affairs of the Company, but that doesn't give them authority to change rates at will or to misapply them".; that he never authorized the writing of the letter to The Cooper Grocery Company; that picture shows, prior to 1919, had been billed for power and lights on the F-1 rate; that it was his recollection that it was in 1938 that he told Mr. Sammons, the commercial manager, "We will look after that matter later (referring to the other consumers billed on the F-1 rate as to both power and lights)", and that such conversation was in 1938; "that the LP-6 was the first combined lighting and power rate that was designed to be available for power consumers of the class in question"; that he talked with Sammons in 1936 about making a change in the commercial lighting rate and again in 1938 about the eleven customers and the picture shows; "* * * we were investigating a larger group of customers and were changing not only the commercial lighting rate but the combined lighting and power rate which was applicable to some of these customers listed in this suit, and at that time we did discuss these customers, some or all of them, and I told him that this new rate would probably enable him to correct that application without increasing their bills, but that would have to be changed anyway. * * * I told him * * * he was going to have to change them, but we should wait until we could see what effect this new rate was going to have."

The commercial manager testified, in part, substantially as follows: That he came to Waco in 1935; that he did not have any information about the rates prior to that time; that it was his duty to see that various consumers in this territory were on the proper rate and that the rate was being properly applied; that the F-1 rate was the only rate the Company did not have a copy of on file with the City Secretary showing the exact application that was being made of such rate; he said the service conditions and the operating conditions and the cost factors in the service to be rendered by the Light Company are the things that are considered in determining the rate; that after the rate is designed and promulgated you can determine the class of consumer that is entitled to such rate by the application clause; that you do not have to know anything about the service conditions, or the operating conditions, or the cost factors of the service in order to ascertain that any customer that has as many as a one horse power and above who operates same as much as one hour per week is entitled to the F-1 rate for power only; the eleven customers and plaintiffs "were entitled to the F-1 rate as to their power only"; there is nothing in the application clause of the F-1 rate and revisions thereof to authorize the giving of a different application of this rate as given to the plaintiffs; "Q. Mr. Sammons, when you found out that this very list that you have in your hand was on the F-1 rate for power and lights, did you look into the setup of those companies? A. I thought they were on the wrong rate myself"; he found nothing in the files of the Light Company nor was any information furnished that authorized the local office to give the F-1 rate as to both power and lights to the eleven customers and not give it to plaintiffs; neither the head of the rate department nor his local manager had ever explained to him why some of the customers on the F-1 schedule in the Waco territory were billed for both power and lights under the F-1 schedule and others were not; in 1935 or 1936, when he found some of these customers were on the F-1 rate as to both power and lights, he did not take them off of that rate until he got the LP-6, because he didn't have anything to put them on without increasing their bills; the LP-6 was the first rate fixed by the Light Company which, by its terms, was available on both power and lights to small customers (he also testified that plaintiffs were on the SE rate, a combination power and light rate, when he came to Waco in 1935); that he knew the Light Company had been using the F-1 rate as a combined power and light rate on these small customers that did not come within the LP-6 and LP-15, and he was referring to the list of eleven customers,

and he knew there were others; that The Cooper Grocery Company, from 1936 and 1937, down to 1938, had the same connected load, hours of operation and character of business, that it had when this company was changed over to the LP–6; the same situation applied to the other consumers named, except Western States Grocery Company, which was no longer in existence; when the LP-6 came out, it was given to plaintiffs and the remaining ten, except Interstate Theaters; that the F–1 rate had been applied differently to its written terms; he had nothing to do with the extension of the F–1 rate as to both power and lights to any of the customers named and was unable to find anything in writing on file at the city hall or in the office of the Company that authorized such extension; this indicated to him that someone unauthorized had extended that rate; that he made a list of consumers on the F–1 rate as to both power and lights for the head of the rate· department but did not remember what period it covered; this list was made in 1935 or 1936, and he talked with Mr. Blair about it, but he did not know whether it was over the telephone or in the office; he did not recall whether Mr. Blair told him at that time to take those customers off of the F–1 as to their power and lights; "when we received the LP–6, those that were qualified for the LP–6 were taken off of the F-1 rate and put on the LP–6; Q. And the inference that you made that he told you in 1936 when you told him that there were customers down here on the F–1 as to both power and lights without being able to quote him exactly, the inference you got from what he said was, 'We will look after that matter later.'? A. Well, the LP–6 came to us in 1938."

Because of the fact that the question of discrimination is vital to the determination of this case, we have given the testimony adduced thereon our most careful consideration and, in our opinion, it is ample to sustain the findings of the jury.

It is true that appellant's expert witness placed the eleven consumers in three groups: (1) Charitable institutions, (2) theaters, and (3) industrial consumers,

The trial court instructed the jury that it could not take into consideration any of the evidence introduced with reference to the Methodist Orphans Home and the Baptist Sanitarium being billed upon the F–1 rate as to both power and lights in arriving at any of the answers to any of the issues submitted to them. There is no complaint to such instruction nor that such instruction was not observed by the jury, and the Light Company's counsel argued to the jury in substance that all of the evidence with reference to the charitable institutions was withdrawn from them. The court did not withdraw the evidence tendered with reference to the Providence Sanitarium, another charitable institution, and such failure, if error, was harmless.

It is also true that the rate expert testified to certain characteristics or billing factors that tended to distinguish groups (2) and (3) from the plaintiffs, but we cannot say that this evidence established such classification as a matter of law and that the Light Company applied its rates accordingly. The rate expert further testified that the F-1 rate, by its application clause, was not available to any one of the eleven on both power and lights, and further testified that such rate was being misapplied to some consumers. Now since the local manager testified specifically that the eleven consumers complained of ought not have been on the F–1 rate as to both their power and lights, and since the commercial manager further testified that the service conditions and operating conditions and the cost factors in the service to be rendered by the Light Company are the things that are considered in determining the rate, and that after the rate is designed and promulgated one can determine the class of consumer that is entitled to such rate by the application clause and that one does not have to know anything about the service conditions or the operating conditions or the cost factors of the service in order to ascertain that any consumer that has as many as one horse power and above who operates same as much as one hour per week is entitled to the F–1 rate for power only, and since the record is without dispute that the eleven consumers and plaintiffs were entitled to the F–1 rate as to their power, it appears to us that the evidence is undisputed that the plaintiffs were similarly situated to the eleven consumers as to their billing factors for power. And since the appellant's local manager testified that all of the eleven consumers ought not to have been on the F–1 rate as to both their power and lights, and since the commercial manager testified that the eleven consumers and plaintiffs "were entitled to the F–1 rate as to their power only," and further testified that he thought the eleven

consumers "were on the wrong rate" and that he did not take such consumers off of the F–1 schedule as to both power and lights until the LP–6 was designed and promulgated and went into effect, at which time such rate was given to the plaintiffs and the other eleven consumers, except the Interstate Theaters and Western States Grocery Company, and since the rate expert admitted that there was discrimination without his knowledge, we think the jury had the right, under all the evidence, to infer that plaintiffs were similarly situated as to the eleven consumers complained of with reference to the service conditions, operating conditions and cost factors determining the rate to which plaintiffs were entitled for current used for lighting; otherwise, the LP–6 rate would not have been available to the plaintiffs and the other consumers as above stated. Our view is that an issue was raised for the jury as to whether plaintiffs were similarly situated with reference to the service conditions, operating conditions and cost factors determining the application and availability of the F–1 rate to such consumers, from January 1, 1918, through October, 1938.

■ Our Legislature has given special privileges to gas, electric current and power corporations, including the right of eminent domain (R.S. Arts. 1435, 1436) and, in addition thereto, has specially provided that "it shall be unlawful for any such corporation to discriminate against any person, corporation, firm, association or place, in the charge for such gas, electric current or power, or in the service rendered under similar and like circumstances" (R.S. Art. 1438). The Light Company, being organized to do a business affected with the public interest, must treat all consumers fairly and without unjust discrimination. All persons are entitled to have the same service on equal terms and at uniform rates, and the Light Company is prohibited "both by the common law and by the statutes of this state, from discriminating between two or more customers, situated under like or similar circumstances, either as to the character of the service rendered or the charges made therefor." Texas Power & Light Co. v. Hilltop Baking Co., Tex.Civ.App., 78 S. W.2d 718, point 3, page 720, and authorities there cited. See also Texas Power & Light Co. v. Doering Hotel Co., Tex.Civ. App., 147 S.W.2d 897; Id., 139 Tex. 351, 162 S.W.2d 938.

■ Did such discrimination constitute an overcharge? We think not. Plaintiffs, among other things, alleged: "That the defendant has had only one printed form of F–1 rate, which by its terms has provided that it was a power rate; and that the defendant has never had in printed or published form any other F–1 rate than the one which formed a part of its contracts with the City of Waco and which was filed with the City Secretary and formed a part of the ordinance hereinafter alleged; * * * that each of said consumers above named (the eleven) are power consumers construed by the defendant to be within the application clause of the F–1 rate; and the defendant during the period as hereinbefore alleged extended to each of said consumers the F–1 rate both as to power and lights, and by granting the same to parties aforesaid so that said rate was made available to power consumers of the same class and character of these plaintiffs as to all of the electric current consumed both power and lights, defendant in failing and refusing to bill these plaintiffs on said schedule has been and is guilty of unjust, unlawful and unfair discrimination to these plaintiffs' damage in the amount of the difference between the amount paid on the actual billing return and the value of all of the power consumed on the F–1 schedule with interest on each amount since the time the bill was paid at the rate of 6% per annum until paid; * * * that these plaintiffs were unable to allege the name of the specific agent of the defendant who extended the F–1 rate both as to power and lights to each of the above power consumers named; that this information is peculiarly within the knowledge of the defendant; but it is alleged that the extension of said rate was specifically authorized by the defendant corporation, and that the same was extended and applied as to each of the specifically named consumers above by the agents and agency and employees authorized by the defendant to act for the defendant in extending and applying its rates in the City of Waco; * * * that these plaintiffs did not know at the time they became a power consumer and a purchaser of power from the defendant that said defendant had extended said F–1 rate to other power consumers both as to power and lights and they did not discover the same at any time prior to October, 1938; and plaintiffs did not have access to defendant's records and the defendant did

not file with the City Secretary of the City of Waco any rate or amended or modified rate showing that the F–1 schedule was being applied both as to power and lights to other consumers entitled to the F–1 rate; * * * and the defendant, with full knowledge that said rate was being extended, * * * permitted said consumers to remain upon the said F–1 rate as to both power and lights * * * and that the defendant ratified, confirmed and acquiesced to the acts of its agents and employees in billing consumers on the F–1 rate as to both power and lights; and the defendant has accepted and retained from each of said consumers the amounts paid on the bills rendered to and paid by them on the F–1 rate as to both power and lights."

Plaintiffs attached to their pleading a statement of their bill, itemized as to power and lights, "and marked Exhibit A and made a part hereof, a chart and table showing the power measured in kilowatt hours consumed by plaintiffs each month since January 1, 1918, down to and including the month of October, 1938, and showing the cost of such electricity and power to the plaintiffs at the rate billed and the value of such power with the bills calculated and rendered entirely on the F–1 schedule and the difference between such cost and value."

We think it is inescapable that plaintiffs' pleadings predicate their recovery on the basis that the F–1 rate is the Company's power rate· and that such rate had been extended by the Company to include the current used for lighting of other power consumers in the City of Waco similarly situated as plaintiffs. The cause was fully developed as pleaded and was submitted to the jury on such theory, and the jury so found.

The City of Waco, in 1911 (power to make rates controlled by Art. 1018, now Art. 1119, R.C.S.), entered into a contract with appellant's predecessor in title, which contract became effective in 1912, and which, among other things, set out the schedule rates to be charged for electric lighting, heat and power, for incandescent, private and commercial purposes at the following rates: "F–1    The rate to the public for power shall be as follows:  6 cents for the first 500 KWH consumed per month, 5 cents for the second 500 KWH consumed per month, and 4 cents for all current in excess of 1000 KWH consumed per month, with a discount amounting to 1 cent per KWH, provided payment is made at the Company's office on or before the 10th of the month succeeding the month during which the current is used."

In 1921 the City of Waco (operating under a home-rule charter since 1914) entered into a contract with the Light Company, which contract, among other things, provided that the Light Company "having succeeded to the rights and obligations of the Waco Electric & Gas Company under the contract between said Company and City of date the 6th day of October, 1911, and which was to run for a period of ten years from the 1st day of January, 1912 * * *, said rights shall be terminated on the 31st day of December, 1921, at which time the agreement and contract evidenced by these Articles shall become effective and shall in all things supersede the same."

Article 12 of said contract provided: "The rate to the public for power shall be as follows:  Schedule F–1 6 cents for the first 500 Kw. h. consumed per month;  5 cents for the next 500 Kw. h. consumed per month and 4 cents for all current consumed in excess of 1000 Kw. h. per month, provided payment is made at the Company's office on or before the 10th day of the month succeeding the month during which the current is used."

Article 13 of this contract expressly provided for the procedure to be followed by the Light Company in the event it desired to apply to the City for change or revision of the rates.  We have previously pointed out the revisions of the F–1 schedule.

All attorneys agreed that the city ordinance, passed and approved December 16, 1930, "became effective on January 15, 1931, and that the same has been in full force and effect at all times since the same became effective; that there were attached to such ordinance, under section 1 thereof, five rates and five rates only, to-wit:  Rate DS–1, which was a rate provided for Domestic Service for residences;  Rate MS–1, which is the Commercial Lighting Rate;  Rate HL–1, which is the Domestic Heating and Cooking rate;  Rate R–1, which is the Optional Lighting Rate;  and Rate F–1, which is the Franchise Power Rate." . Said Ordinance further reads in part as follows: "Section 1:  That from and after billing period beginning January 15, 1931, electric energy will be furnished to the domestic and commercial consumers

of the City of Waco at the rates set out in the schedules hereto attached and made a part hereof, and shall be furnished upon the terms and conditions as therein set forth. Section 2: The attached schedules do not show the terms and conditions upon which energy will be furnished to the consumers usually termed 'Industrial Power Consumers,' and it shall be the duty of any person, firm or corporation furnishing energy to any class of consumers other than prescribed in the attached schedules, to file with the City Secretary of the City of Waco, a standard published rate of industrial power consumers now in effect, as well as any modifications or changes hereafter made." Plaintiffs further pleaded: "Said defendant had contracted and agreed to furnish power to any and all power consumers in the City of Waco upon the F–1 schedule; and that the Texas Power & Light Company during the period from 1918 until the time of the adoption of said ordinance on the 16th day of December, 1930, was furnishing power under the general power rate known as the F–1; that the defendant, after the adoption of the ordinance aforesaid, has had on file with the City Secretary of the City of Waco what is known as the F–1 rate; and in this connection it is shown to the court that the defendant has had only one printed form of F–1 rate, which by its terms has provided that it was a power rate; and that the defendant has never had in printed or published form any other F–1 rate than the one which formed a part of its contract with the City of Waco and which was filed with the City Secretary and formed a part of the ordinance hereinafter alleged."

It seems clear to us that before plaintiffs can establish that the discrimination complained of constituted an overcharge, the burden rested upon them to allege and prove that the F–1 rate as published was the published rate for lighting as well as for power, or that it was the published rate for the combined power and lighting loads, and that they wholly failed to carry such burden. "If we give to the word 'overcharge' its ordinary signification, it means a charge of more than is permitted by law; * * *. There may be an overcharge without discrimination, and there may be an unlawful discrimination without an overcharge, i. e., without a charge higher than the maximum fixed by law." Woodhouse v. Rio Grande Ry. Co., 67 Tex. 416, 3 S.W. 323, 324.

The right of the City to fix the rates to be charged by the Light Company is not assailed. Art. 264, Charter of City of Waco; Sec. 12, Art. 1175, Chap. 13, Title 28, Revised Civil Statutes. The rate-making power vested in the Board of Commissioners by the City Charter is a non-delegable legislative power. Daniel v. Tyrrell & Garth Inv. Co., 127 Tex. 213, 93 S. W.2d 372; Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150; Southwestern Telegraph & Telephone Co. v. City of Dallas, 104 Tex. 114, 134 S. W. 321; Green v. San Antonio Water Supply Co., Tex.Civ.App., 193 S.W. 453. It is likewise well settled that the City was empowered to fix not merely maximum rates but absolute rates. See Community Natural Gas Co. v. Natural Gas & Fuel Co., Tex.Civ.App., 34 S.W.2d 900; Coleman Gas & Oil Co. v. Santa Anna Gas Co., Tex.Civ.App., 58 S.W.2d 540, reversed on other grounds Tex.Com.App., 67 S.W.2d 241; City of Uvalde v. Uvalde Electric & Ice Co., Tex.Com.App., 250 S.W. 140; City of Seymour v. Texas Electric Service Co., 5 Cir., 66 F.2d 814, certiorari denied, 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590. To the same effect see City of Farmersville v. Texas-Louisiana Power Co., Tex. Civ.App., 55 S.W.2d 195, reversed on other grounds Tex.Com.App., 67 S.W.2d 235; Public Service Commission of Montana v. Great Northern Utilities Co., 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080; Economic Gas Co. v. City of Los Angeles, 168 Cal. 448, 143 P. 717, Ann.Cas.1916A, 931; Idaho Power & Light Co. v. Blomquist, 26 Idaho 222, 141 P. 1083, Ann.Cas.1916E, 282.

Our view is that the cause pleaded and proved by the plaintiffs is that the F–1 rate was a power rate and that there is neither pleading nor proof that such rate was filed and approved by the Commissioners as a combined rate for power and lighting; and that such rate was not a legal rate for the combined power and lighting loads of the Light Company's consumers, and therefore the extension of such rate to the eleven named consumers for lights, although authorized by the Light Company, constituted an unlawful discrimination against plaintiffs, but not an overcharge. Cock v. Marshall Gas Co., Tex.Civ.App., 226 S.W. 464, and for collation of authorities.

The next question that presents itself is what damages have plaintiffs suffered by reason of such discrimination, and how

shall such damage be measured? This question has given us much concern because the plaintiffs, except for a period of five months, were metered and billed for electric current used by them for power under the F-1 rate separately from lighting, which rates for power and lighting were the published rates in force and effect. Other consumers similarly situated were metered and billed for all of the electric current used by them for both power and lighting under the F-1 rate, and the record does not show that any of such consumers were in competition with the plaintiffs nor that plaintiffs suffered any damage from a competitive standpoint or by reason of such consumers being charged less than the published rates for lighting. There is no evidence in this case that the F-1 rate or the rates on which plaintiffs were metered for lighting were unreasonable or arbitrary, nor do plaintiffs so contend.

■ We do not believe the measure of damages applicable to the fact situation here has been passed upon by the courts of Texas, unless it is in the case of Cock v. Marshall Gas Co., supra. We believe the rule announced in that case is in accord with that announced by the Supreme Court of the United States in Interstate Commerce Commission v. United States ex rel. Campbell, 289 U.S. 385, 53 S.Ct. 607, 609, 77 L.Ed. 1273. The rule there announced is: "Overcharge and discrimination have very different consequences, and must be kept distinct in thought. When the rate exacted of a shipper is excessive or unreasonable in and of itself, irrespective of the rate exacted of competitors, there may be recovery of the overcharge without other evidence of loss. 'The carrier ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum.' Southern Pac. Co. v. Darnell-Taenzer Lbr. Co., supra, 245 U.S. [531], at page 534, 38 S.Ct. 186 [62 L.Ed. 451]. But a different measure of recovery is applicable 'where a party that has paid only the reasonable rate sues upon a discrimination because some other has paid less.' Southern Pacific Co. v. Darnell-Taenzer Lbr. Co., supra. Such a one is not to recover as of course a payment reasonable in amount for a service given and accepted. He is to recover the damages that he has suffered, which may be more than the preference or less (Pennsylvania

R. Co. v. International Coal Mining Co., supra, 230 U.S. [184], pages 206, 207, 33 S.Ct. 893, [57 L.Ed. 1446]), but which, whether more or less, is something to be proved and not presumed. Id., page 204 of 230 U.S., 33 S.Ct. 893. 'Recovery cannot be had unless it is shown, that as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted.' Keogh v. Chicago & N. W. R. Co., supra, 260 U.S. [156], page 165, 43 S.Ct. 47, 50 [67 L.Ed. 183]. The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less. The answer to that question is not independent of time and place and circumstance. It calls for something more than the use of a mathematical formula. If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered market price (Pennsylvania R. Co. v. International Coal Mining Co., supra, page 207 of 230 U.S., 33 S.Ct. 893 [57 L.Ed. 1446]; Hoover v. Pennsylvania R. R., 156 Pa. 220, 244, 27 A. 282, 22 L.R.A. 263, 36 Am.St.Rep. 43), damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more. * * * There must be full disclosure of the conditions of the business, or of those affecting competition, including, in particular, the capacity of the preferred producers to fix the prices for the market. Only then will the ultimate fact of damage emerge from the evidentiary facts as an appropriate conclusion."

We think the foregoing rule is based upon sound judgment and that the principles of justice are deeply rooted therein and that such rule is applicable here. Plaintiffs, except for five months, were metered and billed for the electric current used by them for power under the F-1 rate separately from lighting, which were the published rates in force and effect. It is true that other consumers similarly situated were metered and billed for all the electric current used by them for both power and lighting under the F-1 rate, but the record does not show that any of such consumers were in competition with the plaintiffs, or that plaintiffs suffered any damage by reason of such consumers being

charged less than the published rate for lighting. Does it follow that plaintiffs would have been in any better position if such consumers had been charged such published rate? We think not. Since none of the favored consumers were in competition with the plaintiffs, we think there is a total absence of evidence of any damage sustained by plaintiffs. This holding is not in conflict with the opinion of this court in Texas Power & Light Co. v. Hilltop Baking Co., supra, because in that case plaintiff sued to recover for an overcharge based on discrimination, and the evidence conclusively showed that the Baking Company, in that case, was metered and billed on the LP rate when in fact it was entitled to be metered and billed on the MR rate, which was a cheaper rate. Nor do we think that this holding is in conflict with the holding in El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S. W.2d 97, 108 A.L.R. 744, because that case involved an overcharge; nor do we think· that this holding is in conflict with that announced by our Supreme Court in Texas Power & Light Co. v. Doering Hotel Co., supra, because no question was raised as to the measure of damages in the application for writ of error, and the question of the measure of damages was not determined by the Supreme Court in that case. Lone Star Gas Co. v. Kelly, Tex. Com.App., 165 S.W.2d 446. The question at bar is one solely of discrimination in the application of the F–1 rate to the current used for lighting. There is no evidence in this case that the F–1 rate, or the rates on which plaintiffs were metered for lighting, were unreasonable or arbitrary, nor do plaintiffs so contend. That the F–1 rate was misapplied (as to lighting) to the eleven consumers by the Light Company is without dispute, but plaintiffs received the benefits of the published rates for power and lighting, and there is no evidence that they suffered any damage from a competitive standpoint, or that they suffered any damage because some other customer was charged a lesser rate for lighting. We think the rule applied in Interstate Commerce Commission v. United States ex rel. Campbell, supra, is a fair and equitable one and, in our opinion, no consumer who has paid the published rate, in the absence of statutory authority, should be allowed to impose a penalty because some other consumer has paid less than the published rate. Cock v. Marshall Gas Co., supra, and for collation of authorities;

Missouri, K. & T. Ry. Co. v. Trinity County Lbr. Co., 1 Tex.Civ.App. 553, 21 S.W. 290, writ dismissed 85 Tex. 405, 21 S.W. 539; Woodhouse v. Rio Grande Ry. Co., supra. To hold otherwise would, in effect, revoke the rate-making power and would render ineffective our discrimination statutes. "When discrimination and that alone is the gist of the offense, the difference between one rate and another is not the measure of the damages suffered by the shipper." Interstate Commerce Commission v. United States ex rel. Campbell, supra. See also Homestead Co. v. Des Moines Electric Co., 8 Cir., 248 F. 439, 12 A.L.R. 390, point page 396. See, also, Kansas Elec. Co. v. Thomas, 123 Kan. 321, 255 P. 33; Louisville & N. R. Co. v. Maxwell, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853, L.R.A.1915E, 665. Our view is that plaintiffs failed to plead and prove that they sustained actual damages as a result of the alleged discrimination, and that they have wholly failed to show any basis for recovery and by reason thereof this cause must be reversed and rendered.

The judgment of the trial court is reversed and rendered.

HALE, Justice (dissenting).

On October 22, 1942, this court rendered its judgment and handed down its opinion affirming the judgment of the trial court in this cause. Upon consideration of appellant's motion for rehearing it has now been decided by the majority to set aside the judgment of affirmance and here render judgment for appellant. I am constrained to adhere to the original judgment of affirmance and to dissent from the substituted judgment of rendition because I believe such is clearly required by the direct authority of: Texas Power & Light Co. v. Hilltop Baking Co., Tex.Civ.App., 78 S. W.2d 718, error dismissed; Raynolds Holding Co. v. El Paso Electric Co., Tex.Civ. App., 70 S.W.2d 624; El Paso Electric Co. v. Raynolds Holding Co., 128 Tex. 495, 100 S.W.2d 97, 108 A.L.R. 744; Texas Power & Light Co. v. Doering Hotel Co., Tex.Civ. App., 147 S.W.2d 897; Id., 139 Tex. 351, 162 S.W.2d 938.

In my opinion, the unlawful discrimination raised by the pleadings, tendered by the evidence and established by the verdict and judgment of the trial court, necessarily consisted of undercharges or overcharges. Either the consumers of electric current who were billed on the F–1 rate for·both

power and light were undercharged, or appellees were overcharged. Before it can be said that the consumers who were billed on the F–1 rate for both power and light were undercharged, it must appear that the F–1 rate as promulgated by the City of Waco was not available to such consumers. Under the written and published provisions of the F–1 rate in Waco from January 1, 1918, through 1938, such rate was clearly available to consumers of current used for power purposes. While the written and published provisions showing the availability of such rate did not specifically include current used by such consumers for lighting purposes also, yet I find nothing in these provisions which directly or indirectly excluded that portion of the current used for lighting purposes from that portion used for power purposes. I cannot say as a matter of law from the voluminous record before us that any consumer who was billed on the F–1 rate for both power and light from 1918 through 1938 was undercharged. On the contrary, it is clear to me that appellant could not be permitted on his record to recover as for undercharges against any consumer so billed. Having voluntarily extended the application of the F–1 rate by its custom and practice so as to cover current used for both power and light, it should not now be heard to insist that under the true intent and meaning of the written and published provisions with respect to such rate, the same was available only for that portion of the current used for power purposes.

Since the F–1 rate was thus lawfully available to some consumers of current used for both power and lighting purposes, it was also lawfully available to all consumers of current used for both power and lighting purposes who were similarly situated with reference to the service conditions and cost factors determining the application and availability of said rate. If the F–1 rate was lawfully available to appellees for the current used by them for both power and lighting purposes, then the unlawful discrimination against them necessarily consisted of overcharges, regardless of any consideration of competition or of the reasonableness or unreasonableness in fact of the charges so made. And if appellees were entitled to be billed on the F–1 rate for all of the current used by them for both power and light, but were actually billed on the F–1 rate for power and on a higher rate for light, then under

the holding in the Hilltop Baking Company and Doering Hotel Company cases, supra, a correct measure of their damages is that which was applied by the trial court.